Page 1

1              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF GEORGIA
2                    MACON DIVISION

3

4    RONALD T. KNIGHT,

5              Plaintiff,
                                    CIVIL ACTION FILE NO.
6    v.                              5:14-cv-000424-MIT

7    NAVIENT LLC and NAVIENT
     SOLUTIONS INC., and such of
8    their known (SLM Corporation
     And Sallie Mae Inc.) and
9    unknown ("John Doe" and "Jane
     Doe") parents, affiliates,
10   subsidiaries, predecessors,
     successors, and agents who may
11   be liable to the plaintiff
     (collectively "Sallie Mae"),

12
               Defendants.
13   _____/

14

15

16             DEPOSITION OF PAUL KNIGHT

17

18        Pages 1 through {}, Inclusive

19        Taken:  Wednesday, October 7, 2015

20           Place:  Fairbanks, Alaska

21

22

23             Veritext Legal Solutions
                 Atlanta Region
24        1075 Peachtree Street, Suite 3625
                 Atlanta GA 30309

25

Page 2

1   Deposition of Paul Knight

2

3                    INDEX OF EXAMINATION

4                                                        PAGE

5

6   Examination by Ms. Martin................................6

7

8

9                     INDEX OF EXHIBITS

10  1 - Lawloans.........................................17

11  3 - SLM Financial Corporation.......................22

12  4 - Excel Grad Loan Application 2003-2004............31

13  5 - A Message From Your Lender......................42

14  6 - September 30, 2003, Letter to Paul Knight.........47

15  7 - Statement of Facts, August 12, 2006..............48

16  8 - Handwritten Statement of Facts..................70

17

18

19

20

21

22

23

24

25

```
                                          Page 3
 1   A P P E A R A N C E S:
 2     For the Plaintiff:          DAVID F. ADDLETON, ESQ.
                                    Addleton, Ltd., Co.
 3                                  355 Cotton Avenue
                                    Macon, Georgia  31201
 4
                                    CHARLES PEKOR
 5                                  Pekor & Associates, LLC
                                    3565 Piedmont Road NE
 6                                  Building One, Suite 460
                                    Atlanta, Georgia  30305
 7
 8     For the Defendant:          BONNIE MARTIN, ESQ.
                                    Ogletree, Deakins, Nash,
 9                                  Smoak & Stewart, P.C.
                                    111 Monument Circle
10                                  Suite 4600
                                    Indianapolis, Indiana  46204
11
12
13        BE IT REMEMBERED that, pursuant to Notice of Taking
14   Deposition, and beginning on Wednesday, the 7th day of
15   October 2015, commencing at the hour of 9:30 a.m.
16   thereof, in the offices of Crystal Thompson, located at
17   104 Kutter Road, Fairbanks, Alaska, before me, Crystal D.
18   Thompson-Bartlett, Notary Public in and for the State of
19   Alaska, personally appeared:
20
21                        PAUL KNIGHT
22
23   called as a witness by the Defendant, who was examined as
24   hereinafter set forth.
25
```

Page 4

1          WEDNESDAY, OCTOBER 7, 2015

2              FAIRBANKS, ALASKA

3                9:30 A.M.

4

5          COURT REPORTER:  Okay.  We're on record at

6    9:30 A.M. Alaska time, October 7th, 2015.  This deposition

7    is being held via video conference.  The court reporter

8    and witness are in Fairbanks, Alaska, and the attorneys

9    are joining via video conference from Georgia and Indiana.

10         This matter is being held in the United States

11   Court, Middle District of Georgia, Macon Division; Ronald

12   T. Knight versus Navient, LLC, and Navient Solutions,

13   Inc., and such of their known (SLM Corporation and Sallie

14   Mae, Inc.) and unknown ("John Doe" and "Jane Doe")

15   parents, affiliates, subsidiaries, predecessors,

16   successors, and agents who may be liable to the plaintiff

17   (collectively "Sallie Mae").  Civil Action Number

18   5:14-cv-00424-MIT.

19         And could I have counsel please identify

20   themselves for the record.

21         MS. MARTIN:  This is Bonnie Martin, counsel

22   for defendants.

23         MR. PEKOR:  This is Chuck -- actually this is

24   Charles Pekor, P-e-k-o-r, co-counsel for the plaintiff.

25         MR. ADDLETON:  This is David Addleton,

Page 5

1   A-d-d-l-e-t-o-n, co-counsel for the plaintiffs.

2              COURT REPORTER:  Thank you.

3              Sir, if I can get you to raise your right

4   hand, please.

5         (Oath administered.)

6              THE WITNESS:  I do.

7              COURT REPORTER:  Thank you.

8              And if you'd just state and spell your name

9   for the record, please.

10             THE WITNESS:  My name is Paul Richard Knight.

11  P-a-u-l R-i-c-h-a-r-d, last name K-n-i-g-h-t.

12             COURT REPORTER:  And if I could get a mailing

13  address for you, please.

14             THE WITNESS:  My mailing address is REDACTED

15  REDACTED              Fairbanks, Alaska REDACTED

16             COURT REPORTER:  And if I could get a daytime

17  phone number, please.

18             THE WITNESS:  Daytime phone number

19  (478) 318-1753.

20             COURT REPORTER:  Okay.  Thank you.

21             Okay, Counsel, you may proceed.

22

23                  PAUL KNIGHT

24  having been first duly sworn by the court reporter to tell

25  the truth, the whole truth, and nothing but the truth,

Page 6

1    testified as follows:

2

3                         EXAMINATION

4    BY MS. MARTIN:

5    Q.    Good morning out there, Mr. Knight.  My name is

6          Bonnie Martin, and I represent the Navient

7          defendants in a lawsuit that was brought by

8          plaintiff, Ronald Knight.

9                I am taking this deposition, as you know, by.

10         Phone, and you are located at the Crystal Thompson

11         reporting agency in Fairbanks, Alaska.

12               Good morning.

13   A.    Good morning.

14   Q.    You had stated your full name for the record and

15         your address.  I appreciate that.

16               Have you been -- ever gone by any other names?

17   A.    No.

18   Q.    Okay.  Well, before we get started with the

19         questions, I'd like to go over how this process

20         works.

21               Have you ever had your deposition taken

22         before, Mr. Knight?

23   A.    No.

24   Q.    Okay.  I know you're certainly somewhat familiar

25         with the process just by training, but if you do not

1          understand a question that I ask at any point,

2          please ask me to rephrase the question; otherwise,

3          I'll assume that you understood my question and that

4          your answer is responsive.

5               Is that fair?

6    A.    Fair enough.

7    Q.    Okay.  Now, to get an accurate written transcript,

8          as you know, all my questions and all your answers

9          are being taken down.  It's preferable to respond

10         verbally instead of nodding or saying "uh-huh."

11              Is that fair?

12   A.    Yes, indeed.

13   Q.    Okay.  This is particularly important given the

14         format of your deposition today, certainly.  I may

15         be able to see you by Web cam to some extent, but as

16         you know, the video will not be recorded for

17         purposes of the deposition here today.

18              As we go forward, certainly, in conversation

19         and -- and particularly when we have a telephone

20         deposition like this, it's easy for our questions

21         and answers to kind of run over one another, and so

22         I will do my best to completely let you finish

23         answering a question before I start another one.

24         And by the same token, I would ask that you allow me

25         to finish my question entirely before you begin

Page 8

```
 1        answering.

 2             Is that fair?

 3   A.   Yes.

 4   Q.   Okay.  Now, this testimony is given under oath, as

 5        you know.  Even though we're in an informal setting,

 6        I'm taking this over the phone, your testimony has

 7        the same force and effect as it's given in a court

 8        of law.

 9             Do you understand that?

10   A.   Yes, I do.

11   Q.   Okay.  Now, are you taking any medications today

12        that would affect your ability to testify truthfully

13        in this case?

14   A.   No, I'm not.

15   Q.   Okay.  Is there anything abnormally bothering you

16        that would affect your ability to testify truthfully

17        today?

18   A.   Not at all.

19   Q.   Okay.  You indicated that you had not had your

20        deposition taken before.

21             Have you ever testified as a witness before in

22        a trial?

23   A.   No, I have not.

24   Q.   Okay.  And you gave your address on the record

25        earlier, so it's correct to say that you don't
```

1          reside or work in Georgia?

2     A.   That is correct, yes.

3     Q.   Okay.  Did you do anything to prepare for your

4          deposition today?

5     A.   Got a good night's rest.

6     Q.   Okay.  Did you speak with anyone about it?

7     A.   I'm not sure I understand.  I -- I -- I was informed

8          that I was going to be given a subpoena.

9     Q.   Okay.  Did you speak with anyone about any topics

10         that would refresh your recollection for today's

11         deposition?

12    A.   No.

13    Q.   Okay.  And you're not represented by an attorney;

14         correct?

15    A.   That's correct.

16              MR. PEKOR:  I didn't hear it.

17              THE WITNESS:  Oh, that's --

18    BY MS. MARTIN:

19    Q.   You're not represented by an attorney; is that

20         correct?

21    A.   That's correct, I am not represented by an attorney

22         here today.

23    Q.   Okay.  Now, the plaintiff, Ronald Knight, is your

24         father; is that correct?

25    A.   Yes, he is my father.

```
 1   Q.    Okay.  Have you discussed this case, the lawsuit,
 2         with him at all?
 3   A.    No, I have not.
 4   Q.    Have you discussed this case with any other family
 5         members?
 6   A.    No, I have not.
 7   Q.    Okay.  Have you reviewed any documents to prepare
 8         for your deposition?
 9   A.    I'm sorry.  Did you say have I reviewed any
10         documents?
11   Q.    Yes.
12   A.    No.
13   Q.    Okay.  And I'm going to go back in time a bit to
14         2003, and when I understand you applied for law
15         school; is that correct?  Or around that period of
16         time?
17   A.    Yes, that's correct.  I was -- I was a late entry
18         into John Marshall Law School.
19   Q.    Okay.  Did you apply to any other schools other than
20         John Marshall?
21   A.    Yes, I did.  I originally applied to Vermont Law
22         School and was accepted on the waiting list.  I
23         would have had to wait another year to -- to become
24         accepted, so I -- and I had heard John Marshall was
25         still accepting applicants, but that they were --
```

1        had not been accredited the American Bar Association

2        and were in the process of getting provisional

3        accreditation.

4   Q.   Okay.  So other than Vermont, did you apply anywhere

5        else for law school?

6   A.   No.

7   Q.   Okay.  Now, when did you begin the financial aid

8        process for law school?

9   A.   A week before classes started.  That would have

10       been, I believe, the -- the second or third week in

11       August.

12  Q.   Okay.  Could it have been as early as July?

13  A.   No.  Because I was accepted and -- I had to go

14       through my acceptance and get accepted, and I

15       actually didn't -- didn't actually go in to meet

16       with the financial aid person until -- yeah, a good

17       two or three weeks before law school started.  I

18       want to say two weeks, yeah.

19  Q.   All right.  Now, when you applied for financial aid

20       for law school, had you ever taken out a student

21       loan before?

22  A.   Yes.  I took out all of my undergraduate loans by

23       myself.

24  Q.   Okay.  Do you recall who services those loans, or

25       who serviced those?

Page 12

1   A.    That was Grant State Management.

2   Q.    Okay.  Are you still paying on those loans?

3   A.    I am.

4   Q.    Okay.  Now, did Sallie Mae service any of your

5         undergraduate loans?

6   A.    No.

7   Q.    Okay.  So we were talking about your application for

8         financial aid for law school.

9               How did you begin that process?  What did you

10        do?

11  A.    I went into the financial aid office at the law

12        school where there was only one person working in

13        there at the time.  She explained to me there were

14        two options available, one through Sallie Mae and

15        one through Nellie Mae.  She explained the two loan

16        programs somewhat.  I didn't see much difference.

17              At the time, I was kind of in a rush to go

18        ahead and take care of the process, so I asked for

19        an application for a Sallie Mae loan.

20  Q.    Okay.  Did you ask for one application or more than

21        one --

22  A.    I just --

23  Q.    -- for the Sallie Mae loan?

24  A.    Just -- well, one application.  She had given it to

25        me to fill out and to turn it back in within, I

Page 13

```
 1        think it was at -- by the end of the week or
 2        something.
 3   Q.   Okay.  Now, where were you living when you were in
 4        law school?
 5   A.   I was living in Macon, Georgia, on North Springs
 6        Court.  The exact address, I want to say it's 124,
 7        but I -- I can't be certain about that.  But I was
 8        in Macon, Georgia, on North Springs Court.  I had a
 9        townhouse.
10   Q.   Okay.  So do you remember the name of the person who
11        was working in the John Marshall financial aid
12        office?
13   A.   Yes.  That was Ms. Acord (ph).
14   Q.   Okay.  All right.  How many times did you speak with
15        Ms. Acord about your financial aid?
16   A.   Let's see, twice in person.  And then after we had
17        originally submitted the application for the Sallie
18        Mae loan, I was talking with some of my colleagues
19        at the law school, and we were discussing the --
20        possibly the Nellie Mae loan program was better
21        because the interest payments were supposed to be --
22        or the payments on -- on it were supposed to be, you
23        know, deferred until after I had completed my law
24        school.
25             So I had gone back to her a third time, and
```

1        this was -- this would have been two weeks into law

2        school at the time.  And I had asked to be -- you

3        know if I could apply for the Nellie Mae loan

4        instead.  She said she would do what she could and

5        get back to me.

6                And I think another week -- at least another

7        week went by and I had left her a phone message

8        asking about the status of my loan because I had

9        been informed by the -- the law school that they had

10       not yet received any payment, and if they -- they

11       needed to receive something at least by the sixth

12       week or I would be dropped.

13               So I had left a phone message for her asking

14       her what the status was.  Of course, this was in the

15       middle of going to law school and driving back and

16       forth from Macon to Atlanta.

17               And yes, to answer your question, I -- I -- I

18       met with her in person probably about three or four

19       times.  Yeah.

20   Q.    Okay.

21   A.    Total.

22   Q.    Did you ever speak with her on the phone or just

23         leave her messages?

24   A.    I kind of remember speaking with her one time on the

25         phone, but I don't recall the conversation.

Page 15

1    Q.    Okay.  So you're not -- you're not entirely sure

2          what any phone conversation would have consisted of.

3                Is that fair to say?

4    A.    Yeah, and I just remember the message that I left.

5    Q.    Okay.  So during the application process, either

6          talking about the Sallie Mae loan or a Nellie Mae

7          loan, did you ever speak with anyone actually from

8          Sallie Mae or Nellie Mae?

9    A.    No.

10   Q.    Okay.  And other than what you've already testified

11         about, did any -- did Ms. Acord tell you anything

12         else specifically about the loans that you remember?

13   A.    No, not much.  I -- I was -- as I say, I -- I --

14         I -- you know, looking back on it, there wasn't a

15         whole lot that was explained or said.

16   Q.    Okay.  So when you went in the first time, you

17         indicated earlier that you asked for an application

18         for the Sallie Mae and an application was given to

19         you; is that correct?

20   A.    Yes, that's correct.

21   Q.    Okay.  What did you do with that application?

22   A.    I took it with me and -- back down to Macon and into

23         the law office at the time where I was doing some

24         part-time work for Knight, Fisher & Mills.  I

25         believe -- I believe Joy Fisher provided a reference

1          for that first application, and my -- and -- and my

2          dad had -- had agreed to -- to be cosigner if --

3          if -- if I needed it, so . . .

4     Q.   Okay.  So prior to the time that you, you know,

5          picked up the loan application and went to Knight &

6          Fisher, had you had any discussions with your father

7          about cosigning a loan for you?

8     A.   Not until I brought the application down.  He -- he

9          thought it --

10    Q.   Okay.

11    A.   Yeah.

12    Q.   So what did you say to your father when you had the

13         application and you went to the law office?  What

14         did you say to him about asking him to cosign?

15    A.   Well, I said, "I don't know that I will be able

16         to -- that -- be approved for this loan on my own,"

17         because I still had student loans in my name, my

18         credit was so-so, and that it might be a good idea

19         if we had -- I had a cosigner on this -- on this --

20         on this -- on this loan.

21    Q.   And what did he say in response?

22    A.   He -- he was okay with it.

23    Q.   Do you remember specifically what he said?

24    A.   I don't.

25    Q.   Okay.  But you had the impression that he was okay

Page 17

```
 1        with it?
 2   A.    Yes.
 3   Q.    Okay.  And so did you give him that application that
 4         you had with you?
 5   A.    Yes.  It was a brief application, and, like I say,
 6         there was just some pertinent parts to be filled in.
 7         I believe both he and -- and Joy looked at it.
 8   Q.    Okay.  Now, I'm going to show you an exhibit, and so
 9         this might take just a second for it to come up, but
10         please bear with me.
11   A.    Okay.
12         (Off record discussion.)
13   BY MS. MARTIN:
14   Q.    Mr. Knight, I am -- well, I am attempting to mark
15         this document as Exhibit 1.
16              And do you have that in front of you,
17         Mr. Knight?
18   A.    I'm sorry?  Can you repeat that.
19   Q.    I have marked this document as Exhibit 1.
20              Do you see it?
21   A.    It just says "Document loading 100 percent."
22   Q.    Okay.
23   A.    I saw -- I saw the previous document, but --
24   Q.    Okay.  Hopefully this won't take up too much time.
25              Okay.  Do you see it now?
```

1    A.    Nope.

2    Q.    No.  Please let me know when you see something on

3          your screen.

4    A.    It just says "Document loading 100 percent."

5    Q.    Okay.

6          (Off record discussion.)

7    BY MS. MARTIN:

8    q.    Okay.  Try this again.

9    A.    There we go.  I've got it.  Exhibit 1?

10   Q.    Yes.

11   A.    Okay.

12   Q.    Great.  All right.  My first exhibit.  It's not

13         letting me use Exhibit 1 anymore.  Apparently it

14         thinks I've already used it.  So we're going to call

15         it Exhibit 2.

16   A.    Okay.

17   Q.    And just for the record, it's the same as Exhibit 1,

18         but we're going to look at it that way.

19             All right.  Have you -- so you can see the --

20             COURT REPORTER:  Ms. Martin, I'm sorry.  We're

21   getting a lot of feedback and I can't hear.

22             MS. MARTIN:  Okay.  Can you hear me now.

23             COURT REPORTER:  Yeah, we're still getting

24   feedback.

25             MS. MARTIN:  There's a lot of echo on this

1    end.  All right.  Well, we'll do the best that we can.

2    I'm sitting as close to the phone as I can.

3    BY MS. MARTIN:

4    Q.    Mr. Knight, have you seen this document before?

5    A.    Yes, I have.

6    Q.    Okay.  What is it?

7    A.    This looks like the application for the loan, Sallie

8          Mae.

9    Q.    Okay.  So to your recollection, this is the

10         application that you received from the John Marshall

11         Law School financial aid office that you took back

12         to Macon that you were just talking about?

13   A.    Yes.

14   Q.    Okay.  And when you received a blank application,

15         did you ask any questions about it or -- or ask for

16         any more information about this particular document?

17   A.    I'm sorry.  Can you repeat the question.  I -- you

18         were breaking up in the beginning.

19   Q.    Sure.  When you received this document, did you ask

20         any questions about it or ask for any more

21         information about it?

22   A.    I just asked, "How soon do I need to get it back to

23         you?"

24   Q.    Okay.  And what were you told?

25   A.    She said within a week's time.

Page 20

1   Q.    Okay.  Do you remember if you were able to get it

2         back to her within a week?

3   A.    Yes, I did.

4   Q.    Okay.  Now, there's handwriting on this document.

5         Is this your handwriting?

6   A.    Some of it.

7   Q.    Okay.  Which part is your handwriting?

8   A.    My name at the top, my social security number, my

9         address.  Let's see, "same as above," the two phone

10        numbers, the loan amount requested, my e-mail.

11        Let's see.  Then I wrote in "Joy Fisher, employer,"

12        the law firm address.

13              Let's see here.  It looks like I also wrote my

14        dad's name in and the home -- his home address and

15        phone number.

16              And that looks like his handwriting on -- for

17        Knight & Fisher, and then the address there at the

18        bottom.  And then my signature at the bottom was

19        written by me, and it looks like his signature was

20        written by him.

21  Q.    Okay.  So some of the information about his income

22        and salary and that, that's your father's

23        handwriting to the best of your knowledge?

24  A.    Yes.

25  Q.    Did you see him fill this out?

Page 21

1   A.    I don't rightly remember, but perhaps.

2   Q.    Okay.  Do you remember if he had any questions for

3         you about it?

4   A.    Nope.  We were just going to see if we got accepted.

5   Q.    Okay.  Now, once it was signed, did you pick it up

6         directly from him, or did he leave it someplace for

7         you to pick up?

8   A.    My recollection, I -- I got -- I got it from him.

9   Q.    Okay.  Was that at the law office?

10  A.    Yes.

11  Q.    Okay.  And is the date of signature correct, the

12        July 23 of 2003?

13  A.    Yes.

14  Q.    Okay.  Does that refresh your memory a little bit

15        about when you were able to go into the financial

16        aid office?

17  A.    Yeah, that would --

18  Q.    When you said earlier you thought it might have been

19        in August.

20  A.    Well -- yeah, that would have been right.  That was

21        the -- that would have been the first time.  Because

22        law school actually started at the beginning of

23        August, so yeah, that would have been --

24  Q.    Okay.

25  A.    -- yeah, two weeks before, right.

1   Q.   Okay.

2   A.   Yeah.

3   Q.   All right.  Now, let's try to scan.  I'm showing

4        you -- or I'm going to -- oh, dear.  These could be

5        connection issues apparently too.  This is tricky.

6             Okay.  All right.  All right.  Now, do you see

7        a document on your screen?

8   A.   Yes.

9   Q.   Okay.  I am marking this as Exhibit 3.

10            Have you seen Exhibit 3 before?

11  A.   Yes, I have.

12  Q.   Okay.  And -- that just went off my screen for a

13       second.

14  A.   Oh.

15  Q.   What is Exhibit 3?

16  A.   It's -- it's not on my screen anymore.  It

17       disappeared.

18  Q.   Oh, okay.  And it's -- there are two pages to

19       Exhibit 3 when it -- when it comes back.  So if you

20       want to scroll through them, that would be fine.

21  A.   Okay.  Okay.  It's back up.

22  Q.   Okay.  And have you seen this document before?

23  A.   Yes, I have.

24  Q.   Okay.  What is this document?

25  A.   This is the application for the loan.  Let me see.

Page 23

1        The -- yeah, that was -- let's see the bottom there.

2        Okay.  That's the fax number.  Okay.  Partner.

3        Okay.  Yeah, this is -- okay.  So yeah, this is the

4        other -- okay.

5             So this would have been the document after the

6        other document that would have -- yeah, spelled out

7        his financial information for the co-borrower.

8        Let's see.

9   Q.   Yeah, this is an SLM Financial Corporation note or

10       application; is that correct?

11  A.   Yes.

12  Q.   Okay.  And does this, at all, refresh your

13       recollection of receiving two different types of

14       applications for loans when you first went into the

15       law school office?

16  A.   Oh, let's see here.  I'm sorry.  Can you repeat the

17       question again, because this --

18  Q.   Did you receive two different applications, the

19       Sallie Mae and the SLM Financial Corporation?

20  A.   I didn't -- I didn't type this page up, if that's

21       what you're asking.

22  Q.   Okay.  Do you know who typed it up?

23  A.   I would assume Ms. Acord.

24  Q.   Okay.  But you don't know?

25  A.   No.

1   Q.   Okay.  Looking at the second page of Exhibit 3, that

2        handwriting.  Do you know whose handwriting that is?

3   A.   No, I don't.  It does not look like my dad's,

4        though.

5   Q.   Does that look like his signature?

6   A.   I don't see a signature.

7   Q.   Down at the bottom of the page.  It's where it says

8        "co-borrower's signature."

9   A.   Let me scroll down.

10  Q.   Sure.

11  A.   Let me see.  Can you scroll down for me, it's not

12       working here.

13  Q.   Oh, sure.

14  A.   Oh, okay.

15  Q.   I did scroll it down as far as it will go.

16  A.   Okay.  Yes, that -- that -- that looks like his --

17       his signature.

18  Q.   Okay.  And looking at the bottom of that document,

19       do you see there's an upside-down fax banner there?

20  A.   Okay.  Where am I looking?

21  Q.   At the bottom of that page.  It's page 2 of Exhibit

22       3.

23  A.   Uh-huh.  What am I looking for?

24  Q.   Do you see an upside-down fax banner that says

25       "Knight & Fisher"?

Page 25

1    A.    Upside-down fax banner.  Okay.  I see the employer

2          name, "Knight & Fisher."

3    Q.    Well, at the very bottom of the document, there's

4          upside-down text.  You know, when you -- when you

5          send a fax or receive a fax --

6    A.    Uh-huh.

7    Q.    -- there's a banner at the top that has information

8          about where it came from.

9    A.    Oh, maybe scroll down a little bit more so I can see

10         that.

11   Q.    Okay.  I -- it's as far down as I can go,

12         unfortunately.

13   A.    Oh, okay.  I don't --

14   Q.    But you see the signature, you just don't see the

15         very bottom of the page?

16   A.    The -- the last -- the last thing I see is "If you

17         have any questions regarding this application or the

18         responsibilities of being a co-borrower, please

19         contact the customer service representatives at

20         1-888-2SALLIE."

21   Q.    Okay.  And you don't have any way to scroll all the

22         way down?

23             So you said -- I guess while we're waiting on

24         that, you said that we -- you recognize the

25         signature at least because it looked like it was

1        your father's signature?

2   A.   Yes.

3   Q.   Did you -- do you know how he received this

4        additional page?

5   A.   I -- I don't recall exactly.  I -- I had thought

6        that there was a page in the -- in the original

7        materials that Ms. Acord gave me, but --

8   Q.   Okay.

9   A.   -- this -- yeah.

10  Q.   So you think that this might have been part of the

11       documents that you -- that you gave him that first

12       time that you gave him Exhibit 2 in Macon?

13  A.   Right.

14  Q.   Okay.  But that's something that you're not sure of?

15  A.   Right.

16  Q.   Okay.  Do you see any of the information on this

17       second page of Exhibit 3 in the handwritten section

18       that is inaccurate?

19  A.   Not to my knowledge, no.

20  Q.   Okay.  Were you present when this document was

21       signed?

22  A.   Was I -- was I present actually when the signature

23       was signed on the document?  I --

24  Q.   Yes.

25  A.   -- don't recall.

1    Q.    Okay.

2          (Off record discussion.)

3    BY MS. MARTIN:

4    Q.    All right.  Back on the record.

5          Mr. Knight, you understand your testimony is

6          still under oath after this break?

7    A.    Yes, I do.

8    Q.    Okay.  So we've been talking about Exhibits 2 and 3.

9          Do you recall what you did with Exhibits 2 and

10         3 once they were signed?

11   A.    Exhibit 2 I returned to and given -- handed that

12         directly to Ms. Acord.  Exhibit 3 here, I am not

13         sure.

14   Q.    Okay.  Do you know if you personally did anything

15         with it?

16   A.    If I understand you correctly, do you mean did I do

17         anything personally to get it back to Ms. Acord?

18   Q.    Right.  Or to do anything with it to send it

19         anywhere else.

20         Do you know if you ever actually got this

21         back?

22   A.    Did I get it back?

23   Q.    Right.

24   A.    No.

25   Q.    Okay.  Did you ever get any response from the school

Page 28

 1          about whether or not that the loan was approved that
 2          we're talking about as Exhibit 2?
 3     A.   No.
 4     Q.   Okay.  Did you hear directly from Sallie Mae or
 5          Nellie Mae about whether this Exhibit 2 loan was
 6          ever approved?
 7     A.   No.  The first correspondence I received was
 8          actually from Sallie Mae, and that was in 2006, by
 9          letter.
10     Q.   Okay.  All right.  And we'll get there in just a
11          minute.
12               So you still needed -- to go to law school,
13          you still needed funding; correct?
14     A.   Right.  I was -- I was given a message by Ms. Acord,
15          I -- I think right before I walked into class that
16          eventually the funds had come through or something
17          to that effect, but I never signed anything to
18          release funds to the school.  So I -- at that
19          point --
20     Q.   Okay.
21     A.   -- I was pretty much immersed in law school.
22     Q.   Okay.  Well, let's take a step back.
23               I think you indicated in your testimony
24          earlier that you had spoken with some of your law
25          school classmates about the possibility of a Nellie

1          Mae loan; is that right?

2     A.     Yes.  Several of my colleagues had -- had -- had

3            made the switch, or at least were talking about it,

4            and we were trying to, you know, understand the --

5            the loan programs better.  And after speaking with

6            them is -- is when I had gone back to Ms. Acord to

7            let her know I would like to, you know, then apply

8            for the Nellie Mae loan.

9     Q.     Okay.  And what did she say?

10    A.     She said, "Okay.  I'll take care of it."

11    Q.     Okay.  And did you take any additional steps to get

12           the Nellie Mae loan?

13    A.     No.  That's the weird part.  I --

14    Q.     Okay.

15    A.     -- I believe I had signed something in her -- in her

16           office, but I never received a copy of anything, nor

17           was I asked to take anything, you know, anywhere.

18    Q.     Okay.  I have just loaded another exhibit.  This

19           will be Exhibit 4 that I'll be showing you in just a

20           moment.

21    A.     Okay.

22    Q.     Did you have any additional discussions with

23           Ms. Acord about the Nellie Mae loan, other than what

24           you just described?

25    A.     The -- when I had gone into her office, there was

1        very little discussion because she had a lot of

2        things going on and I was in between classes, so not

3        much discussion, no.  I had asked her to just let me

4        know what I needed to do.

5                MR. ADDLETON:  Has the Exhibit 4 loaded?

6                MS. MARTIN: It has not.  It has not.  Okay.

7    Here we go.  All right.

8    BY MS. MARTIN:

9    Q.    All right.  Do you see Exhibit 4 on your screen?

10   A.    Yes, I do.

11   Q.    Okay.

12               MR. ADDLETON:  I do not.

13   BY MS. MARTIN:

14   Q.    And if you'd scroll down through this, and let me

15         know when you're done, please.

16               MR. ADDLETON:  I cannot see it.

17               MS. MARTIN:  Okay.  It might take a second

18   because I just saved it.

19               THE WITNESS:  Let's see.  Yeah, I'm -- I'm

20   unable to scroll down.  Let's see.

21        (Off record discussion.)

22   10:29 A.M.

23        (Off record.)

24   10:57 A.M.

25        (On record.)

Page 31

1  BY MS. MARTIN:

2  Q.   So we're back on the record after a break,

3       Mr. Knight.  Thank you for your patience as we try

4       to work out these technical difficulties.

5            Do you understand your testimony is still

6       under oath?

7  A.   Yes, I do.

8  Q.   All right.  And do you have the Excel Grad Loan

9       Application 2003-2004 in front of you?

10 A.   Yes, I do.

11 Q.   All right.

12            MS. MARTIN:  And could that be marked as

13 Exhibit 4, please.

14       (Exhibit 4 marked.)

15 BY MS. MARTIN:

16 Q.   Mr. Knox, have you had a chance to review this

17      document?

18 A.   Not completely, but let's see.

19 Q.   Have you seen this document before?

20 A.   I have, yes.

21 Q.   Okay.  When did you see it?

22 A.   This came as part of the materials in our -- my dad

23      and our investigation into -- into this matter,

24      and -- and this was -- oh, gosh, this must have been

25      sometime at the end of 2011.  We -- he had -- he may

1         have gotten this sooner, I'm not sure.  But I saw

2         this -- yeah, it was -- it was a good two years

3         before I left to come up here to Alaska.

4    Q.   Okay.  So is it your testimony that you did not see

5         this document when you were in law school?

6    A.   No, I didn't.  I obviously see one -- one thing on

7         here that I -- that was different from what I had

8         originally understood.

9    Q.   Okay.  What is that?

10   A.   Under the "loan options."

11   Q.   Yes.

12   A.   It -- it -- it should have been checked "Defer both

13        principle and interest while in school."

14   Q.   Okay.  And is there anything else on this document

15        that appears incorrect to you?

16   A.   No.

17   Q.   Okay.  Now, you talked earlier in your deposition

18        about your request of Ms. Acord to sign you up for

19        the Nellie Mae student loan for your law school

20        education; is that right?

21   A.   Yes.

22   Q.   And she said she would take care of it?

23   A.   Yes.

24   Q.   Okay.  And did you ever go back into the financial

25        aid office to obtain any paperwork for that Nellie

1           Mae loan?

2    A.     I did not.

3    Q.     Okay.  But you knew you had received a loan;

4           correct?

5    A.     I -- I knew that the school had received funding.

6    Q.     Okay.  And you knew that it hadn't come directly

7           from you; correct?

8    A.     That's correct.

9    Q.     Okay.  And you knew that it hadn't come -- the funds

10          themselves hadn't come directly from your father;

11          correct?

12   A.     That's correct.

13   Q.     Okay.  So to the best of your knowledge, you were --

14          you were aware that some student loan funds had to

15          have come through; correct?

16   A.     Yes.

17   Q.     Okay.  And did you ever ask the financial aid office

18          how that occurred?

19   A.     It -- not -- it wasn't until -- let's see.  The law

20          school had -- during my second semester of law

21          school was when we had -- when I found out that the

22          law school had received its provisional

23          accreditation.

24                 And at that point we were going to be -- I --

25          I guess everybody had thought that we were going to

```
 1        be allowed a -- a -- a lesser or cheaper way of --
 2        of funding our law school.  However, even though the
 3        law school was provisionally -- given provisional
 4        accreditation, they continued, the second year, to
 5        go again with -- with offering the Sallie Mae and
 6        Nellie Mae loans.
 7             I, at this point, left John Marshall and
 8        continued to work for the law office.  It was --
 9        let's see.  I -- and I -- yeah, I basically had
10        waited to receive something in the mail as per the
11        loans.  And it wasn't until 2006, which would have
12        been my graduation date, that I had actually
13        received something from Sallie Mae.
14   Q.   Okay.  So let's take a step back.
15             So when you decided to go for the Nellie Mae
16         loan, did you talk to your father about that, that
17         you were going for a different loan?
18   A.   No.
19   Q.   Why not?
20   A.   Well, if Ms. Acord had asked me if I needed a
21        cosigner, I would have said something to him.  He
22        was in the middle of some personal matters, and
23        until I knew something, I -- you know, there really
24        wasn't anything to say.
25   Q.   Okay.  But you knew that you couldn't get a student
```

1          loan on your own already, though; correct?

2     A.   I had presumed so.

3     Q.   Okay.  And you hadn't heard anything that would tell

4          you otherwise; correct?

5     A.   That's correct.

6     Q.   Okay.  And you had said that your father was going

7          through something at that time.  What was he going

8          through?

9     A.   He had -- there was some matters with the law office

10         that -- and his law partners regarding financial

11         issues at the time.  I -- to my -- to my -- to the

12         best of my ability, I wanted to, you know, not

13         involve him.  And unless I was asked to involve him,

14         I wasn't going to.

15    Q.   When you say "involve him," what do you mean?

16    A.   In the changing of the loan.  Because the -- when --

17         when I had asked her to switch it to the Nellie Mae,

18         I would have figured that, you know, if his

19         cosignature was needed, that I would have been

20         notified.

21    Q.   Okay.  And did you assume that his cosignature on

22         the first document could be used for the second?

23    A.   No, I would never assume that.

24    Q.   Okay.  Okay.  But you knew that it was important to

25         keep your father informed about any cosigner

1       obligations that he might be incurring; correct?

2   A.  Can you rephrase the question.  I -- I'm sorry.

3       I --

4   Q.  Sure.  Sure.  You expected that it would be

5       important for you to keep your father in the loop on

6       any cosigner obligations that would apply to him;

7       correct?

8   A.  Yes.

9   Q.  Okay.  So you knew that that was an important thing

10      to do on your part?

11  A.  Yes.  If I needed him as a co -- cosigner on -- on

12      a -- on -- on the loan, that I -- I would have -- I

13      would have notified him, yes.

14  Q.  Okay.  How long did you live at the 168 North

15      Springs Court address in Macon?

16  A.  Until 2009.

17  Q.  Okay.

18  A.  It was actually -- the last year and a half I was

19      there, the place had a significant amount of water

20      damage due to illegal code for that development.

21      All the townhouses in that development were -- had

22      been built illegally, more or less.  So I was in the

23      middle of ripping out the -- and gutting the

24      interior of the townhouse and -- and rebuilding it

25      back.  That was quite an endeavor, as well as trying

1          to work.

2     Q.   Okay.  And the entire time you were working at the

3          law firm?

4     A.   By "entire time," which time period?

5     Q.   Until you the -- until you left the -- that

6          residence in Macon.

7     A.   Oh.  Yes.  There was also -- I -- I was working at

8          the law firm until 2008.  At that point there was a

9          mold problem there in the office building that I

10         undertook mainly at nights, with crew, and I was

11         working with the insurance company to mitigate that.

12         That took a year and a half.

13    Q.   Okay.

14    A.   So a lot going on, yeah.

15    Q.   So after you left law school -- and why did you

16         leave law school?

17    A.   I was trying to -- in order to try to apply for

18         Vermont law school, and I -- there was some things

19         I -- I -- I wasn't happy with, as well as -- I felt

20         like I was too far away.  You know, commuting back

21         and forth got to be a hassle.

22              But also the -- the funding had not changed so

23         that -- that -- you know, in reviewing law schools

24         and their financial aid programs, the law schools

25         that were afforded provisional accreditation were

1       offered a better type of -- of -- of -- of loan

2       servicing, and I -- and I was expecting that that

3       was going to happen, but it did not.

4  Q.   Okay.  And were your grades sufficient for you to

5       continue?

6  A.   Were my grades sufficient for me to continue?

7          Well, that depends, because I had found out

8       that there was a program, or an initial

9       institution -- or -- or -- or agenda, I guess, by

10      the dean who had been asked to come in.  He was from

11      California.  He maintained his California tags.

12          And we were -- we became aware of a deal where

13      all the grades were -- so for example, if you made a

14      C for a course, they would drop it down to a D.

15      They made it tougher in order to gain that

16      provisional accreditation.  So I could have -- yeah,

17      I could -- I -- I --

18  Q.   Okay.  So were you given academic probation at any

19      point?

20  A.   No, huh-uh.

21  Q.   You were not?

22  A.   I was never notified that I was on probation, no.

23  Q.   Okay.  Were you ever notified that you couldn't

24      continue because your grades weren't sufficient?

25  A.   I was notified that my grades were of a level that,

1          yeah, I would need to, you know, go on in and talk

2          to the dean in order to stay, yes.

3     Q.   Okay.  Do you know if your father submitted an

4          appeal on your behalf?

5     A.   I'm sorry.  Did my father what?

6     Q.   Submitted an appeal of that decision on your behalf?

7     A.   No, he did not.

8     Q.   Did you ever discuss that issue with him?

9     A.   Which issue?

10    Q.   About your grades.

11    A.   No.

12    Q.   Okay.  Do you remember what you discussed with him?

13    A.   That I would not be returning to John Marshall law

14         school.

15    Q.   And after the instance where he signed the document

16         that we just looked at as Exhibit 2 and that we

17         looked at as Exhibit 3, did you have any more

18         discussions with him about your financial aid for

19         that first year of law school?

20    A.   Nope.

21    Q.   Okay.  Did he ever ask you how you ended up

22         financing your education?

23    A.   No.  His -- his -- his mind was on other matters.

24    Q.   Okay.  Is it your testimony -- looking at Exhibit 4,

25         is it your testimony that the electronic signature

1   on the second page of Exhibit 4 where it says "Paul

2   R. Knight" and dated "September 2nd, 2003," is not

3   yours?

4 A.  I did not write those numbers and letters, no.

5 Q.  Well, I understand the numbers and the letters, but

6   did you ever go through a computerized process to

7   request a student loan?

8 A.  No.  That's --

9 Q.  Okay.

10 A.  -- that's crazy.

11 Q.  So it's your testimony that that is not -- that does

12   not represent your electronic signature?

13 A.  No, that does not.

14 Q.  Okay.  Did you ever receive -- in addition to having

15   your tuition covered by the loans, did you ever

16   receive any actual cash from a student loan?

17 A.  No, I did not.  And I thought that was weird that I

18   wasn't asked to come in and sign the funds over to

19   the law school.  I --

20 Q.  Okay.

21 A.  Yeah.  But I didn't --

22 Q.  Had you ever had a student loan that disbursed

23   directly to the school?

24 A.  Not -- not without me having to sign for it.

25 Q.  Did you ever contact the financial aid office and

1      ask them why that hadn't happened?

2  A.   When I did -- because I initially -- when I received

3       the first statement from Sallie Mae in 2006, I had

4       written a letter to Sallie Mae.  It was my

5       understanding from my colleagues who had remained on

6       at the law school that during the middle of the

7       second year, Ms. Acord had been released.

8            And my letter to Sallie Mae in -- in 2006

9       had -- had requested a copy of the -- of the --

10      the -- the contract in its entirety so that I could

11      better --

12 Q.   (Indiscernible - phone cut out.)

13 A.   Pardon?

14 Q.   I'm sorry.  I didn't mean to interrupt you.

15 A.   Sure.

16 Q.   Were you saying something additional?

17 A.   I was just saying that in my initial letter in 2006

18      to Sallie Mae, I was requesting a copy of the -- of

19      the contract which I had never -- had not received,

20      so that I could better understand, you know, what it

21      was that I was paying or would be paying for,

22      because they were sending me bills.  Yeah, that was

23      the first one that I had received, was in --

24      sometime in 2006.

25 Q.   Okay.  And but so is it correct to say that while

1         you were at the John Marshall law school, once you

2         started classes and had asked for that Nellie Mae

3         loan, you never went into the financial aid office

4         during that year to ask them why you had not been

5         asked to sign anything to disburse the funds?

6    A.   I -- to -- to be honest, I didn't give it any

7         thought until --

8    Q.   Okay.

9    A.   -- after I had gotten out of law school.

10   Q.   Now, I'm going to a new exhibit.  It is a document

11        that has your name at the top.  It is a letter, and

12        the letter is dated September 16th of 2003.  I think

13        we'll mark it as Exhibit 5.

14             So if you could please let me know when you

15        have that in front of you and it's been marked, that

16        would be helpful.

17   A.   Okay.

18        (Exhibit 5 marked.)

19             THE WITNESS:  Okay.  I've got it here.

20   BY MS. MARTIN:

21   Q.   All right.  Have you seen this document before?

22   A.   I don't recall.

23   Q.   Okay.  So you might have seen it, you just don't

24        know?

25   A.   Yeah, it's not familiar to me.

Page 43

```
 1    Q.    Okay.  Now, on September 16th of 2003, were you

 2          living at 168 North Springs Court?

 3    A.    Yes, I was.

 4    Q.    Okay.  And you see that the letter here is from

 5          Sallie Mae?

 6    A.    Yes.

 7    Q.    Okay.  And the top part informs you that Sallie Mae

 8          servicing has been retained by the First National

 9          Bank in Sioux Falls to service your loan?

10             Do you see that?

11    A.    Yes, I do.

12    Q.    Okay.  And then the second part, the message from

13          Sallie Mae, you see information about the process of

14          servicing and providing you some information about

15          who to call if you have any questions about your

16          loan?

17    A.    Yes, I see the part about "Call us if you have any

18          questions."

19    Q.    Okay.  All right.  So you just don't recall if you

20          received this letter in September of 2003?

21    A.    Well, I may have.  This is -- this is the paragraph

22          here that -- yeah, the -- where it says, "Here's

23          what you can expect next.  Our records show that you

24          are not scheduled to make payments now.  We will

25          send you payment instructions when it is time for
```

```
 1          you to begin repaying your loans."
 2   Q.     Okay.  And the second paragraph states, "If your
 3          loans are not subsidized, you are responsible for
 4          the interest that accrues."
 5                  Do you see that?
 6   A.     Yes.
 7   Q.     Okay.  Looking at the last page --
 8   A.     That was -- sorry.
 9   Q.     -- you see there's a section in bold at the bottom
10          where it's "Loan Information" in bold print?
11   A.     I'm sorry.  It will be on the second page?
12   Q.     And there's a section at the bottom that says "Loan
13          Information" in bold print.
14   A.     Yes, I see that.
15   Q.     Okay.  And do you ever remember receiving this
16          information about your law school loan?  The loan
17          dated September 11th, 2003?
18   A.     No, not on the -- not -- are you asking if I
19          received this on September 11th?
20   Q.     No.  If you remember receiving information that your
21          law school loan is September 11th of 2003.  If you
22          recall.
23   A.     So you're asking me if I received information that
24          my loan had been approved?
25   Q.     Let me ask that a different way.  There might be a
```

Page 45

1           clearer way to ask the question.

2                Did you ever get any information that you

3           recall, other than correspondence like this, from

4           Sallie Mae providing you with a disbursement date

5           for your loan?

6     A.    No.

7     Q.    That you recall.

8     A.    No.  Oh, wait, wait.  Now -- now, what time period?

9     Q.    Well, I guess I'm specifically talking about in

10          2003.

11    A.    No.

12    Q.    Okay.  So is it your understanding that this letter

13          informs you that the loan has been disbursed?

14    A.    Well, it's curious.  The -- the -- the -- on the

15          second page, "The loans referred to in this letter

16          may or may not be fully disbursed.  The total loan

17          amount that is approved for these loans is 23,469."

18                So I'm assuming that's what -- that's as much

19          as I could apply for, but that's --

20    Q.    And you had two semesters of law school; correct?

21    A.    Yes.

22    Q.    Okay.  And so do you know whether the loan were --

23          or the loan was disbursed in two parts, one for the

24          first semester and one for the second?

25    A.    I don't know.

1    Q.    Okay.

2    A.    I -- I don't -- yeah, I don't know how the loan was

3          disbursed.

4    Q.    Okay.  Did you ever call Sallie Mae about your loan?

5    A.    Yes.

6    Q.    Okay.  When was the first time you called Sallie Mae

7          about your law school loan?

8    A.    That was in 2006 when I started receiving letters

9          from Sallie Mae.

10   Q.    Okay.  Well, we looked at this letter from 2003, and

11         you just stated that you don't recall receiving it;

12         correct?

13   A.    That's correct.

14   Q.    Okay.  But it might have come to you in 2003;

15         correct?

16   A.    It may have.

17   Q.    Okay.  Did you ever go on Sallie Mae's Web site to

18         do anything relating to your loan?

19   A.    No.

20   Q.    Now, I'm looking at a new exhibit.  It has your name

21         at the top, Mr. Knight, and it's a letter dated

22         September 30th of 2003.  I'd like to mark it as

23         Exhibit 6.

24              So if you'll just let me know when you have

25         that in front of you and when it's been marked, I'd

1        appreciate it.

2    A.    Okay.

3          (Exhibit 6 marked.)

4                THE WITNESS:  Okay.  I've got it.

5    BY MS. MARTIN:

6    Q.    Have you seen this document before?

7    A.    If I have, I don't remember.

8    Q.    Okay.  So you're not sure?

9    A.    No, I don't remember seeing this document before.

10   Q.    Okay.  Do you know whether it came to your 168 North

11         Springs Court address?

12   A.    It seems to be addressed to that.

13   Q.    Okay.  Were you receiving mail at that address?

14   A.    I was.

15   Q.    Okay.  Were you still living at that address on

16         September 30th of 2003?

17   A.    Yes.

18   Q.    Okay.

19   A.    Or what -- I -- I --

20   Q.    I'm going to a new exhibit.  It is a typewritten

21         document with "Statement of Facts, August 12th,

22         2006."  I'd like to mark it as Exhibit 7.

23                So please let me know when you have that in

24         front of you and when it's been marked as Exhibit 7.

25   A.    Okay.

```
 1          (Exhibit 7 marked.)

 2              THE WITNESS:  Okay.  I've got it.

 3    BY MS. MARTIN:

 4    Q.    Have you seen this document before?

 5    A.    Yes.

 6    Q.    What is it?

 7    A.    "Statement of Facts" that I typed up.  I --

 8    Q.    When did you prepare this?

 9    A.    This was prepared and sent with my letter to Sallie

10          Mae asking for explanation on why I owed so much.

11    Q.    And when did you send that letter to Sallie Mae?

12    A.    When did I send it?

13    Q.    Yes.

14    A.    It would have been a few days after the date.

15    Q.    The August 12th, 2006?

16    A.    Yeah.

17    Q.    Okay.  Looking at the bottom of the letter, it's --

18          you had typewritten "Paul R. Knight, one-year

19          student at John Marshall Law School in Atlanta,

20          Georgia."

21              Do you see that?

22    A.    Yes.

23    Q.    And so you're not indicating that you are still a

24          first-year law student; is that correct?

25    A.    That -- that's correct.  I was basically giving
```

1          reference to who I was.

2     Q.    Okay.  So looking at the first paragraph of this

3          document.

4               And you were aware that the loan you actually

5          received was the Nellie Mae loan; correct?

6     A.    When was I aware of this?

7     Q.    Well, you asked for the Nellie Mae loan; correct?

8     A.    I did.  I -- I did ask for it, yes.

9     Q.    Okay.  And the financial aid individual, Ms. Acord,

10         indicated that she would take care of that; correct?

11    A.    That's correct, uh-huh.

12    Q.    And your first year tuition was paid; correct?

13    A.    I presume so, yes.

14    Q.    Okay.  And so when you say you were "offered two

15         different Grad Excel law loans," why did you say you

16         were "offered two Grad Excel law loans"?

17    A.    No, I wasn't offered two Grad Excel law loans.  I

18         was offered a loan through Sallie Mae and a loan

19         through Nellie Mae.

20    Q.    Okay.  So when you -- when you say that in the

21         second sentence of Exhibit 7, you're referring to

22         one being the law loan -- law student loan that we

23         looked at as Exhibit 2?

24    A.    Well, they were both loans for law school, so I'm --

25    Q.    Okay.

1   A.   -- I guess I'm not understanding.

2   Q.   But not necessarily Grad Excel, called, loans;

3        correct?

4   A.   I am not familiar with the term "Grad-Excel."

5   Q.   Okay.

6   A.   As -- as it -- as -- as it was explained to me,

7        there was a Sallie -- Sallie Mae loan and a Nellie

8        Mae loan.  Both were --

9   Q.   Okay.

10  A.   -- for the law school.

11  Q.   Okay.  And I'm just looking at the language that you

12       used --

13  A.   Okay.

14  Q.   -- Mr. Knight, so I don't mean to --

15  A.   Oh --

16  Q.   -- be confusing, but you state "I was offered two

17       different Grad Excel law loans."

18            So I just want to make sure that we're on the

19       same page about what you're referring to.  And if

20       I'm understanding you correctly, you are talking

21       about the law loan -- law student loan that we

22       looked at as Exhibit 2, and as well as the Excel

23       Grad loan that we talked about as Exhibit 4; is that

24       correct?

25  A.   Oh, I -- I see, yeah.  Yeah, the -- the -- both of

Page 51

1       them were explained to me as Grad Excel law loans,

2       but I'm not sure what you're asking.

3    Q.   Okay.  By Ms. Acord?

4    A.   Yes.

5    Q.   Was that Ms. Acord who explained that to you?

6    A.   Yes.  She was the only one in the financial aid

7       office at that time.

8    Q.   And on the correspondence that you received from

9       Sallie Mae when they were servicing the loan, it

10      described the loan program as Grad Excel; correct?

11   A.   You mean in my -- my -- my -- the letters that

12      Sallie Mae sent me?

13   Q.   Yes.

14   A.   They may have.  I never got any understanding that

15      it was a Nellie Mae loan.  I thought it was a Sallie

16      Mae loan.

17   Q.   Okay.  So you mean that Sallie Mae was servicing

18       your loan; correct?

19   A.   That was kind of the problem.  I -- I thought Nellie

20      Mae was servicing my loan.  Because I had asked her

21      to, and she said she was going to take care of it.

22   Q.   Okay.  But you didn't ask any more questions about

23       who was servicing it during that first year, did

24       you?

25   A.   No, huh-uh, not during my first year.

Page 52

1   Q.   Okay.  And looking at the fifth paragraph of Exhibit
2        7, and the first sentence starts with "The school
3        evidentially received the money because I was
4        informed that they had."
5             Do you see that sentence?
6   A.   Yes.
7   Q.   Who informed you that the school had received the
8        money?
9   A.   The -- not the reception.  The -- I don't know what
10       you'd call her.  The gal in the -- who -- who -- I
11       guess who's in the accounting office for the -- for
12       the law school.
13  Q.   Okay.  So it wasn't Ms. Acord?
14  A.   No.
15  Q.   Is that correct?
16  A.   That -- that's correct.
17  Q.   Okay.  And you state in the next paragraph, "A year
18       later I sent a letter to Nellie Mae regarding my
19       loan packet and did not get a response back."
20            Do you see that?
21  A.   Yes.
22  Q.   How did you know where to send a letter to Nellie
23       Mae?
24  A.   I presume we went online and got their address.
25  Q.   Okay.  And do you know whether Sallie Mae had

1          purchased your loan by that time?

2    A.    No, I had no idea about that.

3    Q.    Okay.  And so you didn't get a response back, and

4          you waited another year; is that correct?

5                When you received the financial statement

6          letter from Sallie Mae.

7    A.    Uh-huh.  Okay.  So -- so we're talking from the year

8          2006 or '5?

9    Q.    Well, you were in law school in 2003.  You state a

10         year later you sent a letter to Nellie Mae.

11               Would that have been 2004?

12   A.    Yeah, that -- probably.  I mean, I -- yeah, if I can

13         see --

14   Q.    Do you know is that the letter that you sent to

15         Nellie Mae?

16   A.    Well, yeah, there was -- there was letters to Nellie

17         Mae, and then there was a letter to Sallie Mae.  The

18         letter to Nellie Mae, I guess, yeah, would have

19         been -- it was before the letter to Sallie Mae, so

20         that possibly could have been a -- yeah, either 2004

21         or early 2005, but yeah.

22   Q.    Okay.  What questions did you ask Nellie Mae?

23   A.    For a -- a copy of the loan contract and the terms

24         of the agreement.

25   Q.    Okay.  Did you have any concerns about your loan at

1        that point?

2    A.    I did because I had not received anything in the

3          mail.

4    Q.    Okay.  And what were you concerned might have

5          happened?

6    A.    I was just concerned that I had not received

7          anything.  I wasn't in law school, so why wasn't I

8          getting billed.

9    Q.    Okay.  And so you sent something to Nellie Mae, and

10         then you didn't hear anything from them --

11   A.    No.

12   Q.    -- but you received a financial statement letter

13         from Sallie Mae in 2005; is that correct?

14   A.    That's correct.

15   Q.    And you state that you called them, meaning Sallie

16         Mae; is that correct?

17   A.    Yes.

18   Q.    Did you call them in 2005?

19   A.    Well, I want to say 2000 -- it was late 2005, I

20         guess, when I had received the letter.  I -- I --

21         I'm -- I'm recalling November or December, so I'm

22         thinking it was probably January or February when I

23         got around to -- to calling them.

24   Q.    Okay.  And whoever it was that you spoke with at

25         Sallie Mae told you that the information, the

1       financial statement letter, was about your loan and

2       that your father had cosigned for it?

3  A.    That's correct.

4  Q.    Okay.  Did you have any questions at that time when

5       they told you that your father had cosigned the

6       loan?

7  A.    I don't recall.  Well, I -- yeah, yeah, yeah.  My

8       questions were "Can you please send me a copy of

9       the -- of the loan agreement."

10  Q.    Okay.  Well, you knew that you hadn't asked your

11       father to cosign the Nellie Mae as you've described;

12       correct?

13  A.    That's correct.  So I'm -- I'm wondering to myself,

14       at that time, you know, "Which loan did I get?"

15  Q.    Okay.  Did you say anything to the -- to Sallie Mae

16       at that time about your question?

17  A.    Other than to ask them also for a -- a copy of -- of

18       whatever loan agreement that they had on file.

19  Q.    Okay.  Okay.  And I'm looking at -- now at the

20       second page of Exhibit 7.  In the first paragraph

21       you describe the payments should be made.

22          And you talked with your father about payment;

23       is that correct?

24  A.    Yeah, but this was later.

25  Q.    When was -- when did you have the discussion with

1            your father about making payments on the loan?

2    A.    At this point -- yeah, I had -- I had -- had -- had

3          told him that I had received a letter from Sallie

4          Mae, and that I had not received a copy of the loan

5          agreement or whatever, and I -- and I was trying to

6          ferret out why is the money different than what I

7          had asked for, why is the interest different than

8          what I had asked for, why were the interest payments

9          not deferred like I had understood that they would

10         be.

11             So I had several questions, but rather than

12         to, you know, come into -- into dispute, my father

13         had recommended that I, you know, pay the -- pay the

14         loan, pay the Sallie Mae loan.

15   Q.    Did you make any payments on the loan?

16   A.    Yes.

17   Q.    Did you personally make the payments?

18   A.    Yeah, I remember making one payment, yeah.

19   Q.    Okay.  So how much was that payment?

20   A.    It was around $300.

21   Q.    Okay.  And did your father make the rest of the

22         payments?

23   A.    Well, evidentially he did, but I -- it was

24         unbeknownst to me.  I was undergoing financial

25         hardship at the time and was trying to, you know,

```
 1          get -- trying to work with Sallie Mae to figure out,
 2          you know, if there was a payment arrangement we
 3          could -- we could do.
 4               He had apparently started receiving
 5          correspondence, unbeknownst to me, I think sometime
 6          in 2007.  And he had begun to make payments.  Like I
 7          said, this -- this was unbeknownst to me, and I did
 8          not find out about it until sometime late in 2008.
 9     Q.   You found out that your father had been making
10          payments?
11     A.   Yeah.
12     Q.   Okay.  Did you have a discussion with him about it
13          at that time?
14     A.   Well, yeah, because I -- I -- I was upset that --
15          that he had -- he had -- he had done that.  I -- I
16          had said, you know, I -- I -- I -- I -- I'm trying
17          to get a copy of -- of -- of these things, and I --
18          and I want them -- you know, because I don't think
19          this is -- this is not the loan that I -- I had
20          asked for.  These are --
21     Q.   But you knew you'd gotten a loan; correct?
22     A.   Pardon?
23     Q.   But you knew you had received a loan; correct?
24     A.   I knew -- well, I knew that the law school had
25          received funding, yes.
```

1   Q.   Okay.  And then it -- it was as a result of you

2        getting a loan; correct?

3   A.   I can only presume.

4   Q.   Okay.  And so you asked for additional time to pay;

5        is that -- did you request a forbearance?

6   A.   I did.

7   Q.   Okay.  And did Sallie Mae give you a forbearance?

8   A.   No.

9   Q.   They did not?  How do you know?

10  A.   I never got anything back.

11  Q.   What do you mean that you didn't get anything back?

12  A.   I never got any correspondence in the mail regarding

13       any kind of forbearance options.

14  Q.   Did you ever speak with someone at Sallie Mae on the

15       phone and request a forbearance verbally?

16  A.   Several times.

17  Q.   Okay.  What did they say to you?

18  A.   We'll get something out to you.

19  Q.   Okay.  But you don't know whether or not they

20       actually entered a forbearance in the system or not?

21  A.   No.

22            COURT REPORTER:  I'm sorry.  Ms. Martin, I'm

23  going to have to interrupt you for just a moment.  We're

24  right next to a railroad track and the train is coming.

25  So if we could pause for just a moment.

```
 1              MS. MARTIN:  Sure, absolutely.  Just let me
 2      know when it's good to continue.
 3              COURT REPORTER:  Thank you.
 4              MS. MARTIN:  Sure.
 5         (Pause in proceedings.)
 6      BY MS. MARTIN:
 7      Q.   So we're still on Exhibit 7, and you were
 8           indicating -- I think my last question was to
 9           confirm that you don't know whether or not Sallie
10           Mae entered a forbearance on its system for you or
11           not; is that fair to say?
12      A.   Yes, I -- I was not aware that they had or --
13      Q.   Okay.  And looking at the last sentence of that
14           first paragraph on page 2, where you say, "It seemed
15           that Sallie Mae was more interested in having the
16           loan extended out as long as they could so as to
17           collect an exorbitant amount of money in the form of
18           interest."
19              Do you see that sentence?
20      A.   Yes.
21      Q.   How did it seem that way?
22      A.   Well, that's what bothered me when I had received
23           the first letter from Sallie Mae and I saw all the
24           interest.  That's what I was, you know, explaining
25           before on -- on Exhibit --
```

1    Q.    Okay.  The last part of that cut out.  You said

2          "before on Exhibit" --

3    A.    -- 4.  On Exhibit 4.

4    Q.    Okay.

5    A.    Yeah.  Where -- where the option to defer both

6          principle and interest while in school, that was

7          what I had thought I was signing up for.

8    Q.    Okay.  But that would actually -- if they didn't

9          defer it as you wanted to, that would actually speed

10         it up; correct?

11   A.    I don't know.  That -- those --

12   Q.    Okay.

13   A.    Yeah, that wasn't explained to me.  That's --

14   Q.    Okay.

15   A.    Yeah.

16   Q.    And with respect to the forbearance, that was an

17         extension that you requested; correct?

18   A.    Yes.

19   Q.    Okay.  And in the next paragraph, in the first

20         sentence, you indicate that you "figured out this

21         loan was indeed not a law program Grad Excel loan,

22         but was indeed a private loan, which limits the

23         ability of transference of the loan."

24              Do you see that sentence?

25   A.    Yes.

1    Q.    Okay.  Now, the law loan that we've looked at as

2          Exhibit 2 was also a private loan; correct?

3    A.    That's what I came to -- to -- to find out, yes.  I

4          guess.  I mean --

5    Q.    Did anyone ever tell you --

6    A.    Well --

7    Q.    -- that any of the loans that you received were

8          federal loans or government loans in any way?

9    A.    Did anyone tell me that these loans were -- were --

10         were federal or government loans?

11   Q.    Yes.

12   A.    Let's see, if I understand you correctly, you're --

13         I mean, it -- no.  These were offered through Sallie

14         Mae and Nellie Mae, which is --

15   Q.    Okay.

16   A.    Yeah.

17   Q.    So no one told you that these loans were government

18         loans?

19   A.    No.

20   Q.    Is that correct?

21   A.    I don't recall them, no.

22   Q.    Okay.

23   A.    I don't think so.

24   Q.    No, that's not correct?

25   A.    No, I don't recall.

1    Q.    Okay.  You state in the next sentence, "We also

2          deliberated with the fraud department at Sallie Mae,

3          who has since been unable to provide us with a

4          complete certified and signed copy of the loan

5          agreement for which my father has been suffering the

6          burden of paying for until a resolve can be

7          reached."

8                Do you see that sentence?

9    A.    Yes.

10   Q.    What did you do to deliberate with the fraud

11         department at Sallie Mae?

12   A.    I -- I was deliberating with them to try and find

13         out what -- why my dad was being held as -- as -- as

14         cosigner and his credit was being threatened as per

15         my loan.

16   Q.    So did -- I guess my question is, how did you

17         participate in that process?  Did you contact the

18         fraud department?

19   A.    No, my dad did.

20   Q.    Okay.  Did you ever have direct discussions with the

21         fraud department at Sallie Mae?

22   A.    Well, yeah, there was -- I -- I did get on the phone

23         with one of the officers in that department to

24         verify certain information and try and explain, you

25         know, why I was -- had some, you know, difficulty

1          understanding what was going on.

2    Q.    Okay.  Do you remember what specifically you asked

3          that individual?

4    A.    No, not right off.  Not at this time.

5    Q.    Okay.  Do you -- was your father present?

6    A.    For some of it.

7    Q.    Okay.  Was this at the law firm?

8    A.    No.  This would have been at his house.

9    Q.    Okay.  Do you remember when the conversation took

10         place?

11   A.    You mean what time of day or --

12   Q.    Oh, what -- let's start with what year?

13   A.    Oh, this would have been -- this is what's confusing

14         me now because this -- I don't remember those

15         conversations until -- until later.

16   Q.    Okay.

17   A.    Yeah.

18   Q.    Did you have more than one conversation with the

19         fraud department?

20   A.    Oh, did I or -- I'm sorry.

21   Q.    Did you personally.

22   A.    I know there was quite a few occasions.  I think I

23         can remember two -- on two occasions I had

24         conversations with the fraud department.

25   Q.    What did -- what did you talk about with them in the

1      second conversation?

2  A.   It was basically the same stuff.  We -- it was just

3       a different, you know, fraud officer, and trying to,

4       you know, get through kind of the red tape and

5       understand "Well, hey, you know, what" -- what --

6       what -- what -- what documents I had and that had

7       been provided to me either by mail or whatever had

8       been kept in a storage unit in Macon, Georgia.  A

9       place called Data Management.  I was late a month on

10      my payment, and for whatever reason, they sold my

11      storage unit out from under me burning all the

12      paper, and had to go around and retrieve what hard

13      items I could.

14           So -- that was -- that was in 2008 -- or 2007,

15      yeah.  But -- so I was trying to, you know, glean

16      and make sense of this so that we, you know,

17      understood, I mean, any -- any -- any type of -- I

18      was just surprised at the amount and the agreement

19      terms.  You know, it -- it was not what I had

20      expected.

21 Q.   Okay.  So did you feel like that Sallie Mae had done

22      something wrong with your loan?

23 A.   I was trying to find out what they had done with my

24      loan.

25 Q.   Okay.  Because you had never spoken with them in the

Page 65

1          whole origination process; correct?

2     A.   That's correct, uh-huh.

3     Q.   Okay.  Did you feel like that the law school had

4          done something wrong with your loans?

5     A.   Well, as I have not been able to establish is

6          whether or not Ms. Acord was an actual employee of

7          the law school.  So I don't know that -- you know, I

8          can't really put any blame on the law school.

9               When I had contacted the financial aid office

10         later, that was when they said, you know, they --

11         you know, any and all loans that I had gotten to go

12         to John Marshall should be listed on the NSDLS.  You

13         know, national database there, the student loan

14         database.  And -- and we went on together.  She

15         walked me through it, and we were both surprised to

16         see that it was not listed.

17    Q.   Why would you think that Ms. Acord was not employed

18         by John Marshall Law School when she worked with

19         you?

20    A.   I don't know.  Something gave me the impression, but

21         I -- I -- you know, I can't be sure.

22    Q.   Okay.  You mean that something gave you impression

23         that what, that she wasn't employed?

24    A.   That she wasn't necessarily an employee of the law

25         school, but that maybe she was an agent for Sallie

1          Mae or Nellie Mae.

2      Q.    Why do you think that?

3      A.    Well, because for one, the -- her predecessors had

4          no -- had no record.  There was a -- there was a

5          disconnect there.  And I -- and I -- I had thought

6          that well, you know, anything that I had signed or

7          presented would be housed somewhere at the law

8          school.

9      Q.    When you say "Her predecessors had no record of the

10         loan," you hadn't been at John Marshall before 2003;

11         correct?

12     A.    I -- I meant her successors.  Sorry.

13     Q.    Successors.  Okay.

14     A.    Yeah.  Sorry.

15     Q.    And who -- who worked at law school after her that

16         you're referring to as her successor?

17     A.    I don't remember her name right off.  There -- but

18         there was two women that were running the financial

19         aid department for the law school.  I did ask them

20         if they were actual employees of the law school and

21         they did say "Yes."  I never asked them directly if

22         Ms. Acord was.

23     Q.    Okay.  Is there any other thing that you think she

24         wasn't employed by the law school?

25     A.    I'm sorry.  You were breaking up on that question.

1   Q.    Sure.  Other than what you testified about, is there

2         any other reason why you believe that she wasn't

3         employed by the law school?

4   A.    Just from what my colleagues said to me, the --

5         the -- the -- the manner in which she was let go.

6   Q.    Okay.  What did -- what did you hear about how she

7         was let go?

8   A.    There one minute, gone the next.

9   Q.    Who told you that?

10  A.    My colleague at law school.

11  Q.    Do you remember who it was?

12  A.    It was Yont (ph).

13  Q.    Is that the first name or last name?

14  A.    Last name.

15  Q.    Okay.  Do you remember the first name?

16  A.    David.

17  Q.    Okay.  Did David work for the law school in any way?

18  A.    No, huh-uh.

19  Q.    Did he tell you what was his basis of knowledge of

20        whether -- of her being there one day, gone the

21        next?

22  A.    Well, he was the president of our class.

23  Q.    Okay.  And did you ever get any information from the

24        law school itself about Ms. Acord's employment?

25  A.    No, I did not.

```
 1    Q.    Okay.  And you say in the last paragraph of this
 2          letter that we've been talking about as Exhibit 7,
 3          "Suffice it to say, I feel I've been swindled into
 4          signing up for a loan program that was not what I
 5          understood it to be."
 6                Who do you feel swindled you?
 7    A.    That's a good question.  I can't really put my
 8          finger on any one person, other than the way in
 9          which the loan programs were handled.  I -- you
10          know, I -- I am not -- I don't feel like I was at,
11          quote/unquote, arms length in the bargaining.
12    Q.    Okay.  But Sallie Mae wasn't involved in the
13          bargaining, to your knowledge; correct?
14    A.    Well, you know, it's kind of curious as to how they
15          were involved.  If the money comes from Sallie Mae,
16          but yet it's from a bank in North Dakota, you know,
17          I -- in other words, if I had known this was going
18          to be a private loan, I could have gone to a bank in
19          Georgia and gotten a much cheaper deal, a much
20          better deal.
21    Q.    But you didn't apply for a federal loan; correct?
22    A.    I applied for a loan to go to law school.
23    Q.    Okay.  But you didn't specifically ask anyone for a
24          federal loan; correct?
25    A.    In my undergraduate, Granite State Management was a
```

1           part of the student loan database systems.  Now,

2           I -- their -- those loans are listed on that

3           database.  Those are transferable, and nothing gave

4           me any kind of indication -- you know, why call it a

5           "Law Excel Grad Loan" if it's nothing more than a

6           private loan?

7     Q.    Well, you knew you were going to graduate school;

8           correct?

9     A.    Yes.

10    Q.    Okay.  What sort of research did you do into the

11          loans that were available when you applied for

12          financial aid when at John Marshall?

13    A.    I trusted the financial aid office on that.  As I

14          said before, I was only offered two loan programs.

15          One a Nellie Mae loan, and one Sallie Mae loan.  And

16          that's, you know, pretty much how it was -- how it

17          was described -- that is how it was described to me.

18    Q.    Okay.

19    A.    The --

20    Q.    So with that, you didn't think that you were getting

21          a federal loan; correct?

22    A.    If I was getting a federal loan.  Is -- is Sallie

23          Mae not affiliated with the federal government?

24    Q.    Well, what was -- what was your knowledge?  Did you

25          think that Sallie Mae was affiliated with the

1          federal government?

2     A.    I thought that I was getting a loan that would have

3          been -- you know, because I had originally was going

4          to John Marshall to -- to then transfer to another

5          law school.  And if I did that, these loans, you

6          know, would -- would -- would then be picked up by

7          the next financial aid loan program.  But they

8          cannot.  They -- they wouldn't.

9     Q.    Okay.

10    A.    They aren't eligible for it.

11    Q.    You didn't ask anyone that question; correct?

12    A.    Not at that time.  I didn't find that out until

13         later.

14    Q.    Okay.  Well, I have one more exhibit to show you,

15         Mr. Knight.  It -- I'd like it to be numbered as

16         Exhibit 8.  It's a handwritten document with

17         "Statement of Facts" at the top.

18              Do you see that?

19              Could you please let me know when it's been

20         marked and you have it in front of you.

21    A.    Yes.

22    Q.    Okay.

23         (Exhibit 8 marked.)

24              THE WITNESS:  Okay.

25    BY MS. MARTIN:

Page 71

1   Q.   Okay.  Have you seen Exhibit 8 before?

2   A.   Yes.

3   Q.   What is that?

4   A.   This is a handwritten "Statement of Facts" that I

5        wrote.

6   Q.   Is this your handwriting?

7   A.   Yes, it is.

8   Q.   When did you make these notes?

9   A.   These would have been made probably around 2009 or

10       2010.

11  Q.   Why did you make them?

12  A.   Well, at that point we were trying to get documents

13       from Sallie Mae and trying to piece together what

14       the deal was.  I was -- thought it important to, you

15       know, write down and recall, as I could, in a

16       statement of facts.

17  Q.   So did you create Exhibit 8 after you created

18       Exhibit 7?

19  A.   Yes.

20  Q.   Okay.  Did you provide this "Statement of Facts,"

21       this Exhibit 8, to anyone else?  Did you give it to

22       your father or to anyone at Sallie Mae?

23  A.   Yes, I did give this to my father when I left for --

24       let's see.  Wait a minute.  When I originally left

25       for Alaska, which would have been late 2011, 2012,

```
 1          perhaps.
 2    Q.    Okay.  And why did you move to Alaska?
 3    A.    I was here in '94 working on the salmon restoration
 4          program.  I've always wanted to come back.  I had
 5          visited Fairbanks several times and just fell in
 6          love with it, so I decided to -- to move back.  And
 7          I had some plans and tried to do it in 2012.
 8          Didn't -- didn't -- didn't make it that year, so
 9          I -- I came in 2013.
10    Q.    Okay.  And when you gave these notes to your dad --
11          I'm talking about Exhibit 8 -- did you talk with him
12          about them?
13    A.    Yes.
14    Q.    What did you say to him?
15    A.    I told him that I didn't think that he should be
16          liable for my law school debt.  I felt strongly
17          about it when I was an undergrad, and I feel
18          strongly about it now.  Because we never got any
19          confirmation that he was an actual cosigner for this
20          loan.
21    Q.    So you say you "felt strongly about it in
22          undergrad."  What do you mean by that?
23    A.    I took all my loans out for undergrad.
24    Q.    Okay.
25    A.    In my name.
```

Page 73

1   Q.   So you felt strongly about your father not being

2        responsible?

3   A.   Yes.  I've always tried to pay my own way.

4   Q.   Okay.  Was he still making payments on the loan at

5        that time?

6   A.   Yes, he was.  And --

7   Q.   Okay.

8   A.   -- that was upsetting, but I understood why he did.

9        He was -- he -- he could not have his credit ruined.

10       At the same time, you know, there was some financial

11       stressors there, so I -- I would help him, you know,

12       and give money as much as I could to help him with

13       the payments.

14  Q.   And how much money did you give to your dad for the

15       payments?

16  A.   In total?

17  Q.   Yes.

18  A.   Oh, man.  I would have to -- I would have to think

19       about that.  Probably -- I mean, I can -- I can say

20       600 for certainty, and then, you know, whatever I --

21       I mean, I would work it off.  You know, I would, you

22       know, do things for them as much as I could to try

23       and help out.  Because it wasn't just me handing him

24       cash, but, you know --

25  Q.   Okay.  So when you say "600 at least," that includes

1           for your labor for him?

2    A.    No.  No.  No.  In the beginning, when I found out

3          that he was making payments, I would -- would --

4          would garnish -- I would garnish a portion of my own

5          paycheck to give him for this.  So, like, you know,

6          $150 out of every paycheck.

7    Q.    How long did you do that?

8    A.    I'm not sure.  A couple of months.

9    Q.    Okay.

10   A.    Until we -- yeah.

11   Q.    And so then you also gave him some money in cash?

12   A.    Yes.  Well, that would have been the money in cash.

13         It was at least 600.

14   Q.    Oh, okay.

15   A.    Yeah.

16   Q.    But you knew that you were responsible for the

17         student loan, at least to some extent; correct?

18   A.    Yes.

19   Q.    Okay.

20   A.    But -- well, yes.  I mean, but which -- you know,

21         I -- I -- my quandary was with the type of agreement

22         that I thought that I had made.  I just felt it odd

23         that I had not really been given a list of

24         agreements or terms, and, you know, signed off on it

25         or something.

1   Q.    Okay.  So, Mr. Knight, when you began your first

2         semester of law school -- I know you indicated that

3         you had a lot going on, you were commuting back and

4         forth.

5              Did you have any other personal difficulties

6         that were given your time or attention?

7   A.    Yeah, my fiancee had just left me.

8   Q.    And did that distract you from you law studies?

9   A.    I tried not to let it.

10  Q.    Did that distract you from your loan application

11        process?

12  A.    "Loan application process."  You mean me going into

13        Acord's office?

14  Q.    Yeah.  Well, your efforts to obtain financial aid

15        and to understand what was going on.

16  A.    Like I say, I left that to Ms. Acord and -- to -- to

17        get that done.  So in the midst of getting a parking

18        pass for school and books and everything like that,

19        I was trying to, you know, get it all done.

20  Q.    Okay.  So you don't feel like that your situation

21        with your fiancee distracted you from anything

22        related to your financial aid; is that fair to say?

23  A.    I guess it may have distracted from all points of my

24        life for a minute, but then again, you know, the

25        law -- my -- my -- my law school, you know, going to

Page 76

```
 1          classes and -- and doing the work, you know, was
 2          probably the biggest distraction from staying on top
 3          of my financial aid.
 4     Q.   Okay.  Was there anything else going on in your life
 5          that was impacting your ability to deal with any
 6          financial aid issues?
 7     A.   Are we still talking while I was in law school?
 8     Q.   Yes.
 9     A.   You know, other -- other than the commute and --
10          let's see.  Well, I guess, yeah, the second semester
11          was when we found out that my dad's partner had been
12          doing some pretty dirty things at the law firm that
13          he was concerned about.  His mental health was --
14          I -- I became concerned about the second semester,
15          yeah.
16     Q.   Okay.  So you were worried about your dad?
17     A.   Yeah.
18     Q.   Is that correct?
19     A.   That's correct, yes.
20     Q.   Okay.  And that was where you still worked from time
21          to time; is that right?
22     A.   Yeah.
23     Q.   Okay.  And you're aware that your father filed a
24          lawsuit again Navient, formerly Sallie Mae; is that
25          correct?
```

1    A.    Yes.

2    Q.    Okay.  And to your knowledge, has Navient done

3          anything improper with respect to your financial aid

4          for law school?

5    A.    I have no idea.

6    Q.    Okay.  Mr. Knight, I don't have any other questions

7          for you at this point.

8                Have you understood my questions, except to

9          the extent that you've informed me otherwise?

10   A.    Yes.

11   Q.    Okay.  And is there any other information regarding

12         your application for financial aid at John Marshall

13         Law School that you have not shared with us today?

14   A.    I'm sorry.  Can -- can you -- can you repeat that

15         question.  I mean, I'm trying to grab my --

16   Q.    Sure.  Sure.  We had some discussion throughout your

17         deposition about the conversations at John Marshall

18         that you had regarding applications for financial

19         aid.  And I just want to make sure that we have

20         discussed all of the conversations that you had at

21         John Marshall about your financial aid.

22   A.    Yes.

23   Q.    Okay.  I have no further questions.

24              COURT REPORTER:  Anybody else have any

25   questions?

1             THE WITNESS:  Pardon?

2             COURT REPORTER:  Mr. Pekor?

3             MR. PEKOR:  No, ma'am.  Unless -- of course,

4    Dave Addleton and I are in different cities, actually, but

5    unless he may have something, I don't believe we have any

6    further questions.

7             COURT REPORTER:  Is that correct,

8    Mr. Addleton?

9             MR. ADDLETON:  I don't see any reason to ask

10   any further questions.

11            COURT REPORTER:  Okay.  Then we're going of

12   record at 12:08 Alaska time.

13   12:08 P.M.

14        (Off record.)

15             END OF DEPOSITION PROCEEDINGS

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E
 2
 3      STATE OF ALASKA          )
                                 ) ss.
 4      FOURTH JUDICIAL DISTRICT )
 5
 6              I, Crystal D. Thompson-Bartlett, Court
        Reporter and Notary Public duly commissioned and qualified
 7      in and for the State of Alaska, do hereby certify that the
        foregoing proceedings were taken electronically before me
 8      and thereafter reduced to typewriting by me or at my
        direction.
 9
                That the foregoing transcript is a full, true,
10      and correct transcript of the proceedings, including
        questions, answers, objections, statements, motions, and
11      exceptions made and taken at the time of the foregoing
        proceedings.
12
                That all documents and/or things requested to
13      be included with the transcript of the proceedings have
        been annexed to and included with the said proceedings.
14
                That I am not a relative or employee or
15      attorney or counsel of any of the parties in these
        proceedings, nor a relative or employee of such attorney
16      or counsel, and that I am not financially interested in
        said proceedings or the outcome thereof.
17
                IN WITNESS WHEREOF, I have set my hand and
18      affixed my Notarial Seal this {} day of {} 2015.
19
20
21              _____
                CRYSTAL D. THOMPSON-BARTLETT
22              Notary Public for Alaska
                My commission expires:  9/15/2018
23
24
25
```

Page 80

1          Ronald Knight v. Navient LLC

2                    Paul Knight

3          INSTRUCTIONS TO THE WITNESS

4          Please read your deposition over

5    carefully and make any necessary corrections.

6    You should state the reason in the

7    appropriate space on the errata sheet for any

8    corrections that are made.

9          After doing so, please sign the errata

10   sheet and date it.

11         You are signing same subject to the

12   changes you have noted on the errata sheet,

13   which will be attached to your deposition.

14         It is imperative that you return the

15   original errata sheet to the deposing

16   attorney within thirty (30) days of receipt

17   of the deposition transcript by you.  If you

18   fail to do so, the deposition transcript may

19   be deemed to be accurate and may be used in

20   court.

21

22

23

24

25   2132933

Page 81

1        Ronald  Knight  v.  Navient  LLC

2                Paul  Knight

3                E  R  R  A  T  A

4                - - - - -

5   PAGE    LINE    CHANGE

6   _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _

7   Reason:_____

8   _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _

9   Reason:_____

10  _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _

11  Reason:_____

12  _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _

13  Reason:_____

14  _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _

15  Reason:_____

16  _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _

17  Reason:_____

18  _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _

19  Reason:_____

20  _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _

21  Reason:_____

22  _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _

23  Reason:_____

24  _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _

25  2132933

Page 82

1          Ronald Knight v. Navient LLC

2                   Paul Knight

3         ACKNOWLEDGMENT OF DEPONENT

4          I, _____, do

5    hereby certify that I have read the foregoing

6    pages and that the same is a correct

7    transcription of the answers given by

8    me to the questions therein propounded,

9    except for the corrections or changes in form

10   or substance, if any, noted in the attached

11   Errata Sheet.

12

13   _____          _____

14   DATE                    SIGNATURE

15

16   Subscribed and sworn to before me this

17   _____  day of _____, 20__.

18

19   My commission expires: _____

20   _____

21   Notary Public

22

23

24

25   2132933

**[& - ahead]**

**&**

**&**  3:5,9 15:24 16:5
20:17 24:25 25:2

**0**

**000424**  1:6
**00424**  4:18

**1**

**1**  1:18 2:10 17:15,19
18:9,13,17
**1-888-2sallie**  25:20
**100**  17:21 18:4
**104**  3:17
**1075**  1:24
**10:29**  30:22
**10:57**  30:24
**111**  3:9
**11th**  44:17,19,21
**12**  2:15
**124**  13:6
**12:08**  78:12,13
**12th**  47:21 48:15
**150**  74:6
**168**  36:14 43:2
47:10
**16th**  42:12 43:1
**17**  2:10

**2**

**2**  5:15 18:15 24:21
26:12 27:8,9,11
28:2,5 39:16 49:23
50:22 59:14 61:2
**20**  82:17
**2000**  54:19
**2003**  2:14 10:14
21:12 40:2 42:12
43:1,20 44:17,21
45:10 46:10,14,22
47:16 53:9 66:10
**2003-2004**  2:12 31:9
**2004**  53:11,20
**2005**  53:21 54:13,18
54:19

**2006**  2:15 28:8
34:11 41:3,8,17,24
46:8 47:22 48:15
53:8
**2007**  57:6 64:14
**2008**  37:8 57:8
64:14
**2009**  36:16 71:9
**2010**  71:10
**2011**  31:25 71:25
**2012**  71:25 72:7
**2013**  72:9
**2015**  1:19 3:15 4:1,6
79:18
**2132933**  80:25
81:25 82:25
**22**  2:11
**23**  21:12
**23,469**  45:17
**2349**  5:14
**2nd**  40:2

**3**

**3**  2:11 22:9,10,15,19
24:1,22 26:17 27:8
27:10,12 39:17
**30**  2:14 80:16
**300**  56:20
**30305**  3:6
**30309**  1:24
**30th**  46:22 47:16
**31**  2:12
**31201**  3:3
**318-1753**  5:19
**355**  3:3
**3565**  3:5
**3625**  1:24

**4**

**4**  2:12 29:19 30:5,9
31:13,14 39:24 40:1
50:23 60:3,3
**42**  2:13
**460**  3:6
**4600**  3:10

**46204**  3:10
**47**  2:14
**478**  5:19
**48**  2:15

**5**

**5**  2:13 42:13,18 53:8
**5:14**  1:6 4:18

**6**

**6**  2:6,14 46:23 47:3
**600**  73:20,25 74:13

**7**

**7**  1:19 2:15 4:1
47:22,24 48:1 49:21
52:2 55:20 59:7
68:2 71:18
**70**  2:16
**7th**  3:14 4:6

**8**

**8**  2:16 70:16,23 71:1
71:17,21 72:11

**9**

**9/15/2018**  79:22
**94**  72:3
**99712**  5:15
**9:30**  3:15 4:3,6

**a**

**a.m.**  3:15 4:3,6
30:22,24
**ability**  8:12,16
35:12 60:23 76:5
**able**  7:15 16:15 20:1
21:15 65:5
**abnormally**  8:15
**absolutely**  59:1
**academic**  38:18
**acceptance**  11:14
**accepted**  10:22,24
11:13,14 21:4
**accepting**  10:25
**accounting**  52:11
**accreditation**  11:3
33:23 34:4 37:25

38:16
**accredited**  11:1
**accrues**  44:4
**accurate**  7:7 80:19
**acknowledgment**
82:3
**acord**  13:13,15
15:11 23:23 26:7
27:12,17 28:14 29:6
29:23 32:18 34:20
41:7 49:9 51:3,5
52:13 65:6,17 66:22
75:16
**acord's**  67:24 75:13
**action**  1:5 4:17
**actual**  40:16 65:6
66:20 72:19
**addition**  40:14
**additional**  26:4
29:11,22 41:16 58:4
**addleton**  3:2,2 4:25
4:25 30:5,12,16
78:4,8,9
**address**  5:13,14
6:15 8:24 13:6 20:9
20:12,14,17 36:15
47:11,13,15 52:24
**addressed**  47:12
**administered**  5:5
**affect**  8:12,16
**affiliated**  69:23,25
**affiliates**  1:9 4:15
**affixed**  79:18
**afforded**  37:25
**agency**  6:11
**agenda**  38:9
**agent**  65:25
**agents**  1:10 4:16
**agreed**  16:2
**agreement**  53:24
55:9,18 56:5 62:5
64:18 74:21
**agreements**  74:24
**ahead**  12:18

**aid** 11:7,16,19 12:8
12:11 13:11,15
19:11 21:16 32:25
33:17 37:24 39:18
40:25 42:3 49:9
51:6 65:9 66:19
69:12,13 70:7 75:14
75:22 76:3,6 77:3
77:12,19,21
**alaska** 1:20 3:17,19
4:2,6,8 5:15 6:11
32:3 71:25 72:2
78:12 79:3,7,22
**allow** 7:24
**allowed** 34:1
**american** 11:1
**amount** 20:10 36:19
45:17 59:17 64:18
**annexed** 79:13
**answer** 7:4 14:17
**answering** 7:23 8:1
**answers** 7:8,21
79:10 82:7
**anybody** 77:24
**anymore** 18:13
22:16
**apparently** 18:13
22:5 57:4
**appeal** 39:4,6
**appeared** 3:19
**appears** 32:15
**applicants** 10:25
**application** 2:12
12:7,19,20,24 13:17
15:5,17,18,21 16:1
16:5,8,13 17:3,5
19:7,10,14 22:25
23:10 25:17 31:9
75:10,12 77:12
**applications** 23:14
23:18 77:18
**applied** 10:14,21
11:19 68:22 69:11
**apply** 10:19 11:4
14:3 29:7 36:6

37:17 45:19 68:21
**appreciate** 6:15
47:1
**appropriate** 80:7
**approved** 16:16
28:1,6 44:24 45:17
**arms** 68:11
**arrangement** 57:2
**asked** 12:18 14:2
15:17 19:22 29:17
30:3 34:20 35:13,17
38:10 40:18 42:2,5
49:7 51:20 55:10
56:7,8 57:20 58:4
63:2 66:21
**asking** 14:8,13
16:14 23:21 44:18
44:23 48:10 51:2
**associates** 3:5
**association** 11:1
**assume** 7:3 23:23
35:21,23
**assuming** 45:18
**atlanta** 1:23,24 3:6
14:16 48:19
**attached** 80:13
82:10
**attempting** 17:14
**attention** 75:6
**attorney** 9:13,19,21
79:15,15 80:16
**attorneys** 4:8
**august** 2:15 11:11
21:19,23 47:21
48:15
**available** 12:14
69:11
**avenue** 3:3
**aware** 33:14 38:12
49:4,6 59:12 76:23

**b**

**back** 10:13 12:25
13:25 14:5,15 15:14
15:22 19:11,22 20:2

22:19,21 27:4,17,21
27:22 28:22 29:6
31:2 32:24 34:14
36:25 37:20 52:19
53:3 58:10,11 72:4
72:6 75:3
**bank** 43:9 68:16,18
**banner** 24:19,24
25:1,7
**bar** 11:1
**bargaining** 68:11,13
**bartlett** 3:18 79:6,21
**basically** 34:9 48:25
64:2
**basis** 67:19
**bear** 17:10
**began** 75:1
**beginning** 3:14
19:18 21:22 74:2
**begun** 57:6
**behalf** 39:4,6
**believe** 11:10 15:25
15:25 17:7 29:15
67:2 78:5
**best** 7:22 19:1 20:23
33:13 35:12
**better** 13:20 29:5
38:1 41:11,20 68:20
**biggest** 76:2
**billed** 54:8
**bills** 41:22
**bit** 10:13 21:14 25:9
**blame** 65:8
**blank** 19:14
**bold** 44:9,10,13
**bonnie** 3:8 4:21 6:6
**books** 75:18
**borrower** 23:7
25:18
**borrower's** 24:8
**bothered** 59:22
**bothering** 8:15
**bottom** 20:18,18
23:1 24:7,18,21
25:3,15 44:9,12

48:17
**break** 27:6 31:2
**breaking** 19:18
66:25
**brief** 17:5
**brought** 6:7 16:8
**building** 3:6 37:9
**built** 36:22
**burden** 62:6
**burning** 64:11

**c**

**c** 3:1 5:11 38:14
79:1,1
**california** 38:11,11
**call** 18:14 43:15,17
46:4 52:10 54:18
69:4
**called** 3:23 46:6
50:2 54:15 64:9
**calling** 54:23
**cam** 7:15
**care** 12:18 29:10
32:22 49:10 51:21
**carefully** 80:5
**case** 8:13 10:1,4
**cash** 40:16 73:24
74:11,12
**certain** 13:7 62:24
**certainly** 6:24 7:14
7:18
**certainty** 73:20
**certified** 62:4
**certify** 79:7 82:5
**chance** 31:16
**change** 81:5
**changed** 37:22
**changes** 80:12 82:9
**changing** 35:16
**charles** 3:4 4:24
**cheaper** 34:1 68:19
**checked** 32:12
**chuck** 4:23
**circle** 3:9

cities 78:4
civil 1:5 4:17
class 28:15 67:22
classes 11:9 30:2
   42:2 76:1
classmates 28:25
clearer 45:1
close 19:2
code 36:20
colleague 67:10
colleagues 13:18
   29:2 41:5 67:4
collect 59:17
collectively 1:11
   4:17
come 17:9 28:16
   32:3 33:6,9,10,15
   38:10 40:18 46:14
   56:12 72:4
comes 22:19 68:15
coming 58:24
commencing 3:15
commission 79:22
   82:19
commissioned 79:6
commute 76:9
commuting 37:20
   75:3
company 37:11
complete 62:4
completed 13:23
completely 7:22
   31:18
computerized 40:6
concerned 54:4,6
   76:13,14
concerns 53:25
conference 4:7,9
confirm 59:9
confirmation 72:19
confusing 50:16
   63:13
connection 22:5
consisted 15:2

contact 25:19 40:25
   62:17
contacted 65:9
continue 38:5,6,24
   59:2
continued 34:4,8
contract 41:10,19
   53:23
conversation 7:18
   14:25 15:2 63:9,18
   64:1
conversations 63:15
   63:24 77:17,20
copy 29:16 41:9,18
   53:23 55:8,17 56:4
   57:17 62:4
corporation 1:8
   2:11 4:13 23:9,19
correct 8:25 9:2,14
   9:15,20,21,24 10:15
   10:17 15:19,20
   21:11 23:10 28:13
   33:4,7,8,11,12,15
   35:1,4,5 36:1,7
   41:25 45:20 46:12
   46:13,15 48:24,25
   49:5,7,10,11,12
   50:3,24 51:10,18
   52:15,16 53:4 54:13
   54:14,16 55:3,12,13
   55:23 57:21,23 58:2
   60:10,17 61:2,20,24
   65:1,2 66:11 68:13
   68:21,24 69:8,21
   70:11 74:17 76:18
   76:19,25 78:7 79:10
   82:6
corrections 80:5,8
   82:9
correctly 27:16
   50:20 61:12
correspondence
   28:7 45:3 51:8 57:5
   58:12

cosign 16:14 55:11
cosignature 35:19
   35:21
cosigned 55:2,5
cosigner 16:2,19
   34:21 35:25 36:6,11
   62:14 72:19
cosigning 16:7
cotton 3:3
counsel 4:19,21,24
   5:1,21 79:15,16
couple 74:8
course 14:14 38:14
   78:3
court 1:1 4:5,7,11
   5:2,7,12,16,20,24
   8:7 13:6,8 18:20,23
   36:15 43:2 47:11
   58:22 59:3 77:24
   78:2,7,11 79:6
   80:20
covered 40:15
crazy 40:10
create 71:17
created 71:17
credit 16:18 62:14
   73:9
crew 37:10
crystal 3:16,17 6:10
   79:6,21
curious 45:14 68:14
customer 25:19
cut 41:12 60:1
cv 1:6 4:18

| d |
| --- |

d 3:17 5:1,1,11
   38:14 79:6,21
dad 16:2 31:22
   62:13,19 72:10
   73:14 76:16
dad's 20:14 24:3
   76:11
dakota 68:16

damage 36:20
data 64:9
database 65:13,14
   69:1,3
date 21:11 34:12
   45:4 48:14 80:10
   82:14
dated 40:2 42:12
   44:17 46:21
dave 78:4
david 3:2 4:25 67:16
   67:17
day 3:14 63:11
   67:20 79:18 82:17
days 48:14 80:16
daytime 5:16,18
deakins 3:8
deal 38:12 68:19,20
   71:14 76:5
dean 38:10 39:2
dear 22:4
debt 72:16
december 54:21
decided 34:15 72:6
decision 39:6
deemed 80:19
defendant 3:8,23
defendants 1:12
   4:22 6:7
defer 32:12 60:5,9
deferred 13:23 56:9
deliberate 62:10
deliberated 62:2
deliberating 62:12
department 62:2,11
   62:18,21,23 63:19
   63:24 66:19
depends 38:7
deponent 82:3
deposing 80:15
deposition 1:16 2:1
   3:14 4:6 6:9,21 7:14
   7:17,20 8:20 9:4,11
   10:8 32:17 77:17
   78:15 80:4,13,17,18

**describe** 55:21
**described** 29:24
  51:10 55:11 69:17
  69:17
**development** 36:20
  36:21
**difference** 12:16
**different** 23:13,18
  32:7 34:17 44:25
  49:15 50:17 56:6,7
  64:3 78:4
**difficulties** 31:4
  75:5
**difficulty** 62:25
**direct** 62:20
**direction** 79:8
**directly** 21:6 27:12
  28:4 33:6,10 40:23
  66:21
**dirty** 76:12
**disappeared** 22:17
**disburse** 42:5
**disbursed** 40:22
  45:13,16,23 46:3
**disbursement** 45:4
**disconnect** 66:5
**discuss** 39:8
**discussed** 10:1,4
  39:12 77:20
**discussing** 13:19
**discussion** 17:12
  18:6 27:2 30:1,3,21
  55:25 57:12 77:16
**discussions** 16:6
  29:22 39:18 62:20
**dispute** 56:12
**distract** 75:8,10
**distracted** 75:21,23
**distraction** 76:2
**district** 1:1,1 4:11
  79:4
**division** 1:2 4:11
**document** 17:15,19
  17:21,23 18:4 19:4
  19:16,19 20:4 22:7

22:22,24 23:5,6
24:18 25:3 26:20,23
31:17,19 32:5,14
35:22 39:15 42:10
42:21 47:6,9,21
48:4 49:3 70:16
**documents** 10:7,10
  26:11 64:6 71:12
  79:12
**doe** 1:9,9 4:14,14
**doing** 15:23 76:1,12
  80:9
**driving** 14:15
**drop** 38:14
**dropped** 14:12
**due** 36:20
**duly** 5:24 79:6

### e

**e** 3:1,1 4:24 5:1
  20:10 79:1,1 81:3
**earlier** 8:25 15:17
  21:18 28:24 32:17
**early** 11:12 53:21
**easy** 7:20
**echo** 18:25
**education** 32:20
  39:22
**effect** 8:7 28:17
**efforts** 75:14
**either** 15:5 53:20
  64:7
**electronic** 39:25
  40:12
**electronically** 79:7
**eligible** 70:10
**employed** 65:17,23
  66:24 67:3
**employee** 65:6,24
  79:14,15
**employees** 66:20
**employer** 20:11
  25:1
**employment** 67:24

**endeavor** 36:25
**ended** 39:21
**entered** 58:20 59:10
**entire** 37:2,4
**entirely** 7:25 15:1
**entirety** 41:10
**entry** 10:17
**errata** 80:7,9,12,15
  82:11
**esq** 3:2,8
**establish** 65:5
**eventually** 28:16
**everybody** 33:25
**evidentially** 52:3
  56:23
**exact** 13:6
**exactly** 26:5
**examination** 2:3,6
  6:3
**examined** 3:23
**example** 38:13
**excel** 2:12 31:8
  49:15,16,17 50:2,4
  50:17,22 51:1,10
  60:21 69:5
**exceptions** 79:11
**exhibit** 17:8,15,19
  18:9,12,13,15,17
  22:9,10,15,19 24:1
  24:21 26:12,17
  27:11,12 28:2,5
  29:18,19 30:5,9
  31:13,14 39:16,17
  39:24 40:1 42:10,13
  42:18 46:20,23 47:3
  47:20,22,24 48:1
  49:21,23 50:22,23
  52:1 55:20 59:7,25
  60:2,3 61:2 68:2
  70:14,16,23 71:1,17
  71:18,21 72:11
**exhibits** 2:9 27:8,9
**exorbitant** 59:17
**expect** 43:23

**expected** 36:4 64:20
**expecting** 38:2
**expires** 79:22 82:19
**explain** 62:24
**explained** 12:13,15
  15:15 50:6 51:1,5
  60:13
**explaining** 59:24
**explanation** 48:10
**extended** 59:16
**extension** 60:17
**extent** 7:15 74:17
  77:9

### f

**f** 3:2 79:1
**facts** 2:15,16 47:21
  48:7 70:17 71:4,16
  71:20
**fail** 80:18
**fair** 7:5,6,11 8:2
  15:3 59:11 75:22
**fairbanks** 1:20 3:17
  4:2,8 5:15 6:11 72:5
**falls** 43:9
**familiar** 6:24 42:25
  50:4
**family** 10:4
**far** 24:15 25:11
  37:20
**father** 9:24,25 16:6
  16:12 33:10 34:16
  35:6,25 36:5 39:3,5
  55:2,5,11,22 56:1
  56:12,21 57:9 62:5
  63:5 71:22,23 73:1
  76:23
**father's** 20:22 26:1
**fax** 23:2 24:19,24
  25:1,5,5
**february** 54:22
**federal** 61:8,10
  68:21,24 69:21,22
  69:23 70:1

**feedback** 18:21,24
**feel** 64:21 65:3 68:3
   68:6,10 72:17 75:20
**fell** 72:5
**felt** 37:19 72:16,21
   73:1 74:22
**ferret** 56:6
**fiancee** 75:7,21
**fifth** 52:1
**figure** 57:1
**figured** 35:18 60:20
**file** 1:5 55:18
**filed** 76:23
**fill** 12:25 20:25
**filled** 17:6
**financial** 2:11 11:7
   11:16,19 12:8,11
   13:11,15 19:11
   21:15 23:7,9,19
   32:24 33:17 35:10
   37:24 39:18 40:25
   42:3 49:9 51:6 53:5
   54:12 55:1 56:24
   65:9 66:18 69:12,13
   70:7 73:10 75:14,22
   76:3,6 77:3,12,18
   77:21
**financially** 79:16
**financing** 39:22
**find** 57:8 61:3 62:12
   64:23 70:12
**fine** 22:20
**finger** 68:8
**finish** 7:22,25
**firm** 20:12 37:3,8
   63:7 76:12
**first** 5:24 15:16 16:1
   18:12 21:21 23:14
   26:11 28:7 35:22
   39:19 41:3,23 43:8
   45:24 46:6 48:24
   49:2,12 51:23,25
   52:2 55:20 59:14,23
   60:19 67:13,15 75:1

**fisher** 15:24,25 16:6
   20:11,17 24:25 25:2
**follows** 6:1
**forbearance** 58:5,7
   58:13,15,20 59:10
   60:16
**force** 8:7
**foregoing** 79:7,9,11
   82:5
**form** 59:17 82:9
**format** 7:14
**formerly** 76:24
**forth** 3:24 14:16
   37:21 75:4
**forward** 7:18
**found** 33:21 38:7
   57:9 74:2 76:11
**four** 14:18
**fourth** 79:4
**fraud** 62:2,10,18,21
   63:19,24 64:3
**front** 17:16 31:9
   42:15 46:25 47:24
   70:20
**full** 6:14 79:9
**fully** 45:16
**funding** 28:13 33:5
   34:2 37:22 57:25
**funds** 28:16,18 33:9
   33:14 40:18 42:5
**further** 77:23 78:6
   78:10

**g**

**g** 5:11
**ga** 1:24
**gain** 38:15
**gal** 52:10
**garnish** 74:4,4
**georgia** 1:1 3:3,6 4:9
   4:11 9:1 13:5,8
   48:20 64:8 68:19
**getting** 11:2 18:21
   18:23 54:8 58:2
   69:20,22 70:2 75:17

**give** 17:3 42:6 58:7
   71:21,23 73:12,14
   74:5
**given** 7:13 8:4,7 9:8
   12:24 15:18 27:11
   28:14 34:3 38:18
   74:23 75:6 82:7
**giving** 48:25
**glean** 64:15
**go** 6:19 7:18 10:13
   11:13,15 12:17 18:9
   21:15 24:15 25:11
   28:12 30:7 32:24
   34:5,15 39:1 40:6
   46:17 64:12 65:11
   67:5,7 68:22
**going** 9:8 10:13
   14:15 17:8 18:14,18
   21:4 22:4 30:2
   33:24,25 34:17 35:6
   35:7,14 37:14 38:3
   42:10 47:20 51:21
   58:23 63:1 68:17
   69:7 70:3 75:3,12
   75:15,25 76:4 78:11
**good** 6:5,12,13 9:5
   11:16 16:18 32:2
   59:2 68:7
**gosh** 31:24
**gotten** 32:1 42:9
   57:21 65:11 68:19
**government** 61:8,10
   61:17 69:23 70:1
**grab** 77:15
**grad** 2:12 31:8
   49:15,16,17 50:2,4
   50:17,23 51:1,10
   60:21 69:5
**grades** 38:4,6,13,24
   38:25 39:10
**graduate** 69:7
**graduation** 34:12
**granite** 68:25
**grant** 12:1

**great** 18:12
**guess** 25:23 33:25
   38:9 45:9 50:1
   52:11 53:18 54:20
   61:4 62:16 75:23
   76:10
**gutting** 36:23

**h**

**h** 5:11,11
**half** 36:18 37:12
**hand** 5:4 79:17
**handed** 27:11
**handing** 73:23
**handled** 68:9
**handwriting** 20:4,5
   20:7,16,23 24:2,2
   71:6
**handwritten** 2:16
   26:17 70:16 71:4
**happen** 38:3
**happened** 41:1 54:5
**happy** 37:19
**hard** 64:12
**hardship** 56:25
**hassle** 37:21
**health** 76:13
**hear** 9:16 18:21,22
   28:4 54:10 67:6
**heard** 10:24 35:3
**held** 4:7,10 62:13
**help** 73:11,12,23
**helpful** 42:16
**hereinafter** 3:24
**hey** 64:5
**highway** 5:15
**home** 20:14,14
**honest** 42:6
**hopefully** 17:24
**hour** 3:15
**house** 63:8
**housed** 66:7
**huh** 7:10 24:23 25:6
   38:20 49:11 51:25
   53:7 65:2 67:18

**i**

**idea**   16:18 53:2 77:5
**identify**   4:19
**illegal**   36:20
**illegally**   36:22
**immersed**   28:21
**impacting**   76:5
**imperative**   80:14
**important**   7:13
   35:24 36:5,9 71:14
**impression**   16:25
   65:20,22
**improper**   77:3
**inaccurate**   26:18
**included**   79:13,13
**includes**   73:25
**including**   79:10
**inclusive**   1:18
**income**   20:21
**incorrect**   32:15
**incurring**   36:1
**index**   2:3,9
**indiana**   3:10 4:9
**indianapolis**   3:10
**indicate**   60:20
**indicated**   8:19 15:17
   28:23 49:10 75:2
**indicating**   48:23
   59:8
**indication**   69:4
**indiscernible**   41:12
**individual**   49:9 63:3
**informal**   8:5
**information**   19:16
   19:21 20:21 23:7
   25:7 26:16,23 43:13,14
   44:10,13,16,20,23
   45:2 54:25 62:24
   67:23 77:11
**informed**   9:7 14:9
   35:25 52:4,7 77:9
**informs**   43:7 45:13
**initial**   38:8 41:17

**initially**   41:2
**instance**   39:15
**institution**   38:9
**instructions**   43:25
   80:3
**insurance**   37:11
**interest**   13:21 32:13
   44:4 56:7,8 59:18
   59:24 60:6
**interested**   59:15
   79:16
**interior**   36:24
**interrupt**   41:14
   58:23
**investigation**   31:23
**involve**   35:13,13,15
**involved**   68:12,15
**issue**   39:8,9
**issues**   22:5 35:11
   76:6
**items**   64:13

**j**

**jane**   1:9 4:14
**january**   54:22
**john**   1:9 4:14 10:18
   10:20,24 13:11
   19:10 34:7 39:13
   42:1 48:19 65:12,18
   66:10 69:12 70:4
   77:12,17,21
**joining**   4:9
**joy**   15:25 17:7 20:11
**judicial**   79:4
**july**   11:12 21:12

**k**

**k**   4:24 5:11
**keep**   35:25 36:5
**kept**   64:8
**kind**   7:21 12:17
   14:24 51:19 58:13
   64:4 68:14 69:4
**knew**   33:3,5,6,9
   34:23,25 35:24 36:9
   55:10 57:21,23,24

57:24 69:7 74:16
**knight**   1:4,16 2:1,14
   3:21 4:12 5:10,23
   6:5,8,22 9:23 15:24
   16:5 17:14,17 19:4
   20:17 24:25 25:2
   27:5 31:3 40:2
   46:21 48:18 50:14
   70:15 75:1 77:6
   80:1,2 81:1,2 82:1,2
**know**   6:9,24 7:8,16
   8:5 13:23 14:3
   15:14 16:4,15 18:2
   23:22,24 24:2 25:4
   26:3 27:14,20 29:4
   29:7,7,17 30:4,15
   34:23 35:12,18
   37:20,23 39:1,3
   41:20 42:14,24
   45:22,25 46:2,24
   47:10,23 52:9,22,25
   53:14 55:14 56:12
   56:13,25 57:2,16,18
   58:9,19 59:2,9,24
   60:11 62:25,25
   63:22 64:3,4,5,15
   64:16,19 65:7,7,10
   65:11,13,20,21 66:6
   68:10,14,16 69:4,16
   70:3,6,19 71:15
   73:10,11,20,21,22
   73:24 74:5,20,24
   75:2,19,24,25 76:1
   76:9
**knowledge**   20:23
   26:19 33:13 67:19
   68:13 69:24 77:2
**known**   1:8 4:13
   68:17
**knox**   31:16
**kutter**   3:17

**l**

**l**   5:1,11

**labor**   74:1
**language**   50:11
**late**   10:17 54:19
   57:8 64:9 71:25
**law**   8:8 10:14,18,21
   11:5,8,17,20 12:8
   12:11 13:4,19,23
   14:1,9,15 15:23
   16:13 19:11 20:12
   21:9,22 23:15 28:12
   28:21,24 32:5,19
   33:19,20,22 34:2,3
   34:8 35:9,10 37:3,8
   37:15,16,18,23,24
   39:13,19 40:19 41:6
   42:1,9 44:16,21
   45:20 46:7 48:19,24
   49:15,16,17,22,22
   49:24 50:10,17,21
   50:21 51:1 52:12
   53:9 54:7 57:24
   60:21 61:1 63:7
   65:3,7,8,18,24 66:7
   66:15,19,20,24 67:3
   67:10,17,24 68:22
   69:5 70:5 72:16
   75:2,8,25,25 76:7
   76:12 77:4,13
**lawloans**   2:10
**lawsuit**   6:7 10:1
   76:24
**leave**   14:23 21:6
   37:16
**left**   14:7,13 15:4
   32:3 34:7 37:5,15
   71:23,24 75:7,16
**legal**   1:23
**lender**   2:13
**length**   68:11
**lesser**   34:1
**letter**   2:14 28:9 41:4
   41:8,17 42:11,12
   43:4,20 45:12,15
   46:10,21 48:9,11,17
   52:18,22 53:6,10,14

53:17,18,19 54:12
54:20 55:1 56:3
59:23 68:2
**letters**  40:4,5 46:8
51:11 53:16
**letting**  18:13
**level**  38:25
**liable**  1:11 4:16
72:16
**life**  75:24 76:4
**limits**  60:22
**line**  81:5
**list**  10:22 74:23
**listed**  65:12,16 69:2
**little**  21:14 25:9 30:1
**live**  36:14
**living**  13:3,5 43:2
47:15
**llc**  1:7 3:5 4:12 80:1
81:1 82:1
**loaded**  29:18 30:5
**loading**  17:21 18:4
**loan**  2:12 11:21
12:15,19,23 13:18
13:20 14:3,8 15:6,7
16:5,7,16,20 19:7
20:10 22:25 28:1,5
29:1,5,8,12,23 31:8
32:10,19 33:1,3,14
34:16,17 35:1,16
36:12 38:1 40:7,16
40:22 42:3 43:9,16
44:10,12,16,16,21
44:24 45:5,13,16,22
45:23 46:2,4,7,18
49:4,5,7,18,18,22,22
50:7,8,21,21,23
51:9,10,15,16,18,20
52:19 53:1,23,25
55:1,6,9,14,18 56:1
56:4,14,14,15 57:19
57:21,23 58:2 59:16
60:21,21,22,23 61:1
61:2 62:4,15 64:22
64:24 65:13 66:10

68:4,9,18,21,22,24
69:1,5,6,14,15,15,21
69:22 70:2,7 72:20
73:4 74:17 75:10,12
**loans**  11:22,24 12:2
12:5 15:12 16:17
23:14 34:6,11 40:15
44:1,3 45:15,17
49:15,16,17,24 50:2
50:17 51:1 61:7,8,8
61:9,10,17,18 65:4
65:11 69:2,11 70:5
72:23
**located**  3:16 6:10
**long**  36:14 59:16
74:7
**look**  18:18 24:3,5
**looked**  17:7 25:25
39:16,17 46:10
49:23 50:22 61:1
**looking**  15:14 24:1
24:18,20,23 39:24
44:7 46:20 48:17
49:2 50:11 52:1
55:19 59:13
**looks**  19:7 20:13,16
20:19 24:16
**loop**  36:5
**lot**  15:15 18:21,25
30:1 37:14 75:3
**love**  72:6

---

**m**

**ma'am**  78:3
**macon**  1:2 3:3 4:11
13:5,8 14:16 15:22
19:12 26:12 36:15
37:6 64:8
**mae**  1:8,11 4:14,17
12:4,14,15,19,23
13:18,20 14:3 15:6
15:6,8,8,18 19:8
23:19 28:4,5,8 29:1
29:8,12,23 32:19
33:1 34:5,6,13,15

35:17 41:3,4,8,18
42:2 43:5,7,13 45:4
46:4,6,9 48:10,11
49:5,7,18,19 50:7,8
51:9,12,15,16,17,20
52:18,23,25 53:6,10
53:15,17,17,18,19
53:22 54:9,13,16,25
55:11,15 56:4,14
57:1 58:7,14 59:10
59:15,23 61:14,14
62:2,11,21 64:21
66:1,1 68:12,15
69:15,15,23,25
71:13,22 76:24
**mae's**  46:17
**mail**  20:10 34:10
47:13 54:3 58:12
64:7
**mailing**  5:12,14
**maintained**  38:11
**making**  56:1,18 57:9
73:4 74:3
**man**  73:18
**management**  12:1
64:9 68:25
**manner**  67:5
**mark**  17:14 42:13
46:22 47:22
**marked**  17:19 31:12
31:14 42:15,18
46:25 47:3,24 48:1
70:20,23
**marking**  22:9
**marshall**  10:18,20
10:24 13:11 19:10
34:7 39:13 42:1
48:19 65:12,18
66:10 69:12 70:4
77:12,17,21
**martin**  2:6 3:8 4:21
4:21 6:4,6 9:18
17:13 18:7,20,22,25
19:3 27:3 30:6,8,13
30:17 31:1,12,15

42:20 47:5 48:3
58:22 59:1,4,6
70:25
**materials**  26:7
31:22
**matter**  4:10 31:23
**matters**  34:22 35:9
39:23
**mean**  27:16 35:15
41:14 50:14 51:11
51:17 53:12 58:11
61:4,13 63:11 64:17
65:22 72:22 73:19
73:21 74:20 75:12
77:15
**meaning**  54:15
**meant**  66:12
**medications**  8:11
**meet**  11:15
**members**  10:5
**memory**  21:14
**mental**  76:13
**message**  2:13 14:7
14:13 15:4 28:14
43:12
**messages**  14:23
**met**  14:18
**middle**  1:1 4:11
14:15 34:22 36:23
41:6
**midst**  75:17
**mills**  15:24
**mind**  39:23
**minute**  28:11 67:8
71:24 75:24
**mit**  1:6 4:18
**mitigate**  37:11
**mold**  37:9
**moment**  29:20 58:23
58:25
**money**  52:3,8 56:6
59:17 68:15 73:12
73:14 74:11,12
**month**  64:9

**months** 74:8
**monument** 3:9
**morning** 6:5,12,13
**motions** 79:10
**move** 72:2,6

**n**

**n** 3:1 5:1,11
**name** 5:8,10,11 6:5
6:14 13:10 16:17
20:8,14 25:2 42:11
46:20 66:17 67:13
67:13,14,15 72:25
**names** 6:16
**nash** 3:8
**national** 43:8 65:13
**navient** 1:7,7 4:12
4:12 6:6 76:24 77:2
80:1 81:1 82:1
**ne** 3:5
**necessarily** 50:2
65:24
**necessary** 80:5
**need** 19:22 39:1
**needed** 14:11 16:3
28:12,13 30:4 34:20
35:19 36:11
**nellie** 12:15 13:20
14:3 15:6,8 28:5,25
29:8,12,23 32:19,25
34:6,15 35:17 42:2
49:5,7,19 50:7
51:15,19 52:18,22
53:10,15,16,18,22
54:9 55:11 61:14
66:1 69:15
**never** 28:17 29:16
35:23 38:22 41:19
42:3 51:14 58:10,12
64:25 66:21 72:18
**new** 42:10 46:20
47:20
**night's** 9:5
**nights** 37:10

**nodding** 7:10
**nope** 18:1 21:4
39:20
**north** 13:5,8 36:14
43:2 47:10 68:16
**notarial** 79:18
**notary** 3:18 79:6,22
82:21
**note** 23:9
**noted** 80:12 82:10
**notes** 71:8 72:10
**notice** 3:13
**notified** 35:20 36:13
38:22,23,25
**november** 54:21
**nsdls** 65:12
**number** 4:17 5:15
5:17,18 20:8,15
23:2
**numbered** 70:15
**numbers** 20:10 40:4
40:5

**o**

**o** 4:24 5:1
**oath** 5:5 8:4 27:6
31:6
**objections** 79:10
**obligations** 36:1,6
**obtain** 32:25 75:14
**obviously** 32:6
**occasions** 63:22,23
**occurred** 33:18
**october** 1:19 3:15
4:1,6
**odd** 74:22
**offered** 38:1 49:14
49:16,17,18 50:16
61:13 69:14
**offering** 34:5
**office** 12:11 13:12
15:23 16:13 19:11
21:9,16 23:15 29:16
29:25 32:25 33:17
34:8 35:9 37:9

40:25 42:3 51:7
52:11 65:9 69:13
75:13
**officer** 64:3
**officers** 62:23
**offices** 3:16
**ogletree** 3:8
**oh** 9:17 22:4,14,18
23:16 24:13,14 25:9
25:13 31:24 37:7
45:8 50:15,25 63:12
63:13,20 73:18
74:14
**okay** 4:5 5:20,21
6:18,24 7:7,13 8:4
8:11,15,19,24 9:3,6
9:9,13,23 10:1,7,13
10:19 11:4,7,12,24
12:2,4,7,20 13:3,10
13:14 14:20 15:1,5
15:10,16,21 16:4,10
16:22,25,25 17:3,8
17:11,22,24,25 18:5
18:8,11,16,22 19:6
19:9,14,24 20:1,4,7
20:21 21:2,5,9,11
21:14,24 22:1,6,9
22:12,18,21,21,22
22:24 23:2,2,3,3,4
23:12,22,24 24:1,14
24:16,18,20 25:1,11
25:13,21 26:8,14,16
26:20 27:1,8,14,25
28:4,10,20,22 29:9
29:10,11,14,18,21
30:6,11,17 31:21
32:4,9,14,17,24
33:3,6,9,13,17
34:14,25 35:3,6,21
35:24,24 36:9,14,17
37:2,13 38:4,18,23
39:3,12,21,24 40:9
40:14,20 41:25 42:8
42:17,19,23 43:1,4
43:7,12,19 44:2,7

44:15 45:12,22 46:1
46:4,6,10,14,17
47:2,4,8,10,13,15,18
47:25 48:2,17 49:2
49:9,14,20,25 50:5
50:9,11,13 51:3,17
51:22 52:1,13,17,25
53:3,7,22,25 54:4,9
54:24 55:4,10,15,19
55:19 56:19,21
57:12 58:1,4,7,17
58:19 59:13 60:1,4
60:8,12,14,19 61:1
61:15,22 62:1,20
63:2,5,7,9,16 64:21
64:25 65:3,22 66:13
66:23 67:6,15,17,23
68:1,12,23 69:10,18
70:9,14,22,24 71:1
71:20 72:2,10,24
73:4,7,25 74:9,14
74:19 75:1,20 76:4
76:16,20,23 77:2,6
77:11,23 78:11
**once** 21:5 27:10 42:1
**online** 52:24
**option** 60:5
**options** 12:14 32:10
58:13
**order** 37:17 38:15
39:2
**original** 26:6 80:15
**originally** 10:21
13:17 32:8 70:3
71:24
**origination** 65:1
**outcome** 79:16
**owed** 48:10

**p**

**p** 3:1,1 4:24 5:11
**p.c.** 3:9
**p.m.** 78:13
**packet** 52:19

[page - reason]

**page** 2:4 23:20 24:1 24:7,21,21 25:15 26:4,6,17 40:1 44:7 44:11 45:15 50:19 55:20 59:14 81:5
**pages** 1:18 22:18 82:6
**paid** 49:12
**paper** 64:12
**paperwork** 32:25
**paragraph** 43:21 44:2 49:2 52:1,17 55:20 59:14 60:19 68:1
**pardon** 41:13 57:22 78:1
**parents** 1:9 4:15
**parking** 75:17
**part** 15:24 20:7 26:10 29:13 31:22 36:10 43:7,12,17 60:1 69:1
**participate** 62:17
**particular** 19:16
**particularly** 7:13,19
**parties** 79:15
**partner** 23:2 76:11
**partners** 35:10
**parts** 17:6 45:23
**pass** 75:18
**patience** 31:3
**paul** 1:16 2:1,14 3:21 5:10,23 40:1 48:18 80:2 81:2 82:2
**pause** 58:25 59:5
**pay** 56:13,13,14 58:4 73:3
**paycheck** 74:5,6
**paying** 12:2 41:21 41:21 62:6
**payment** 14:10 43:25 55:22 56:18 56:19 57:2 64:10

**payments** 13:21,22 43:24 55:21 56:1,8 56:15,17,22 57:6,10 73:4,13,15 74:3
**peachtree** 1:24
**pekor** 3:4,5 4:23,24 9:16 78:2,3
**percent** 17:21 18:4
**period** 10:15 37:4 45:8
**person** 11:16 12:12 13:10,16 14:18 68:8
**personal** 34:22 75:5
**personally** 3:19 27:14,17 56:17 63:21
**pertinent** 17:6
**ph** 13:13 67:12
**phone** 5:17,18 6:10 8:6 14:7,13,22,25 15:2 19:2 20:9,15 41:12 58:15 62:22
**pick** 21:5,7
**picked** 16:5 70:6
**piece** 71:13
**piedmont** 3:5
**place** 1:20 36:19 63:10 64:9
**plaintiff** 1:5,11 3:2 4:16,24 6:8 9:23
**plaintiffs** 5:1
**plans** 72:7
**please** 4:19 5:4,9,13 5:17 7:2 17:10 18:2 25:18 30:15 31:13 42:14 47:23 55:8 70:19 80:4,9
**point** 7:1 28:19 33:24 34:7 37:8 38:19 54:1 56:2 71:12 77:7
**points** 75:23
**portion** 74:4
**possibility** 28:25

**possibly** 13:20 53:20
**predecessors** 1:10 4:15 66:3,9
**preferable** 7:9
**prepare** 9:3 10:7 48:8
**prepared** 48:9
**present** 26:20,22 63:5
**presented** 66:7
**president** 67:22
**presume** 49:13 52:24 58:3
**presumed** 35:2
**pretty** 28:21 69:16 76:12
**previous** 17:23
**principle** 32:13 60:6
**print** 44:10,13
**prior** 16:4
**private** 60:22 61:2 68:18 69:6
**probably** 14:18 53:12 54:22 71:9 73:19 76:2
**probation** 38:18,22
**problem** 37:9 51:19
**proceed** 5:21
**proceedings** 59:5 78:15 79:7,10,11,13 79:13,15,16
**process** 6:19,25 11:2 11:8 12:9,18 15:5 40:6 43:13 62:17 65:1 75:11,12
**program** 13:20 38:8 51:10 60:21 68:4 70:7 72:4
**programs** 12:16 29:5 37:24 68:9 69:14
**propounded** 82:8
**provide** 62:3 71:20
**provided** 15:25 64:7

**providing** 43:14 45:4
**provisional** 11:2 33:22 34:3 37:25 38:16
**provisionally** 34:3
**public** 3:18 79:6,22 82:21
**purchased** 53:1
**purposes** 7:17
**pursuant** 3:13
**put** 65:8 68:7

**q**

**qualified** 79:6
**quandary** 74:21
**question** 7:1,2,3,23 7:25 14:17 19:17 23:17 36:2 45:1 55:16 59:8 62:16 66:25 68:7 70:11 77:15
**questions** 6:19 7:8 7:20 19:15,20 21:2 25:17 43:15,18 51:22 53:22 55:4,8 56:11 77:6,8,23,25 78:6,10 79:10 82:8
**quite** 36:25 63:22
**quote** 68:11

**r**

**r** 3:1 4:24 5:11,11 40:2 48:18 79:1 81:3,3
**railroad** 58:24
**raise** 5:3
**reached** 62:7
**read** 80:4 82:5
**really** 34:23 65:8 68:7 74:23
**reason** 64:10 67:2 78:9 80:6 81:7,9,11 81:13,15,17,19,21 81:23

**rebuilding** 36:24
**recall** 11:24 14:25
  26:5,25 27:9 42:22
  43:19 44:22 45:3,7
  46:11 55:7 61:21,25
  71:15
**recalling** 54:21
**receipt** 80:16
**receive** 14:11 23:18
  25:5 34:10 40:14,16
**received** 14:10
  19:10,14,19 26:3
  28:7 29:16 33:3,5
  33:22 34:13 41:2,19
  41:23 43:20 44:19
  44:23 49:5 51:8
  52:3,7 53:5 54:2,6
  54:12,20 56:3,4
  57:23,25 59:22 61:7
**receiving** 23:13
  44:15,20 46:8,11
  47:13 57:4
**reception** 52:9
**recognize** 25:24
**recollection** 9:10
  19:9 21:8 23:13
**recommended**
  56:13
**record** 4:5,20 5:9
  6:14 8:24 17:12
  18:6,17 27:2,4
  30:21,23,25 31:2
  66:4,9 78:12,14
**recorded** 7:16
**records** 43:23
**red** 64:4
**reduced** 79:8
**reference** 15:25
  49:1
**referred** 45:15
**referring** 49:21
  50:19 66:16
**refresh** 9:10 21:14
  23:12

**regarding** 25:17
  35:10 52:18 58:12
  77:11,18
**region** 1:23
**related** 75:22
**relating** 46:18
**relative** 79:14,15
**release** 28:18
**released** 41:7
**remained** 41:5
**remember** 13:10
  14:24 15:4,12 16:23
  20:1 21:1,2 39:12
  44:15,20 47:7,9
  56:18 63:2,9,14,23
  66:17 67:11,15
**remembered** 3:13
**repaying** 44:1
**repeat** 17:18 19:17
  23:16 77:14
**rephrase** 7:2 36:2
**reporter** 4:5,7 5:2,7
  5:12,16,20,24 18:20
  18:23 58:22 59:3
  77:24 78:2,7,11
  79:6
**reporting** 6:11
**represent** 6:6 40:12
**representatives**
  25:19
**represented** 9:13,19
  9:21
**request** 32:18 40:7
  58:5,15
**requested** 20:10
  41:9 60:17 79:12
**requesting** 41:18
**research** 69:10
**reside** 9:1
**residence** 37:6
**resolve** 62:6
**respect** 60:16 77:3
**respond** 7:9
**response** 16:21
  27:25 52:19 53:23

**responsibilities**
  25:18
**responsible** 44:3
  73:2 74:16
**responsive** 7:4
**rest** 9:5 56:21
**restoration** 72:3
**result** 58:1
**retained** 43:8
**retrieve** 64:12
**return** 80:14
**returned** 27:11
**returning** 39:13
**review** 31:16
**reviewed** 10:7,9
**reviewing** 37:23
**richard** 5:10
**right** 5:3 11:19
  13:14 18:12,19 19:1
  21:20,25 22:3,6,6
  26:13,15 27:4,18,23
  28:10,14,15 29:1
  30:7,9 31:8,11
  32:20 42:21 43:19
  58:24 63:4 66:17
  76:21
**rightly** 21:1
**ripping** 36:23
**road** 3:5,17
**ronald** 1:4 4:11 6:8
  9:23 80:1 81:1 82:1
**ruined** 73:9
**run** 7:21
**running** 66:18
**rush** 12:17

**s**

**s** 3:1
**salary** 20:22
**sallie** 1:8,11 4:13,17
  12:4,14,19,23 13:17
  15:6,8,18 19:7
  23:19 28:4,8 34:5
  34:13 41:3,4,8,18
  43:5,7,13 45:4 46:4

46:6,9,17 48:9,11
  49:18 50:7,7 51:9
  51:12,15,17 52:25
  53:6,17,19 54:13,15
  54:25 55:15 56:3,14
  57:1 58:7,14 59:9
  59:15,23 61:13 62:2
  62:11,21 64:21
  65:25 68:12,15
  69:15,22,25 71:13
  71:22 76:24
**salmon** 72:3
**saved** 30:18
**saw** 17:23,23 32:1
  59:23
**saying** 7:10 41:16
  41:17
**says** 17:21 18:4 24:7
  24:24 40:1 43:22
  44:12
**scan** 22:3
**scheduled** 43:24
**school** 10:15,18,22
  11:5,8,17,20 12:8
  12:12 13:4,19,24
  14:2,9,15 19:11
  21:22 23:15 27:25
  28:12,18,21,25 32:5
  32:13,19 33:5,20,21
  33:22 34:2,3 37:15
  37:16,18 39:14,19
  40:19,23 41:6 42:1
  42:9 44:16,21 45:20
  46:7 48:19 49:24
  50:10 52:2,7,12
  53:9 54:7 57:24
  60:6 65:3,7,8,18,25
  66:8,15,19,20,24
  67:3,10,17,24 68:22
  69:7 70:5 72:16
  75:2,18,25 76:7
  77:4,13
**schools** 10:19 37:23
  37:24

**screen**  18:3 22:7,12
22:16 30:9
**scroll**  22:20 24:9,11
24:15 25:9,21 30:14
30:20
**seal**  79:18
**second**  11:10 17:9
22:13 24:1 26:17
30:17 33:20 34:4
35:22 40:1 41:7
43:12 44:2,11 45:15
45:24 49:21 55:20
64:1 76:10,14
**section**  26:17 44:9
44:12
**security**  20:8
**see**  7:15 12:16 13:16
17:20,25 18:2,19
20:9,11,13,25 21:4
22:6,25 23:1,8,16
24:6,11,19,24 25:1
25:9,14,14,16 26:16
30:9,16,19,20 31:18
31:21 32:4,6 33:19
34:9 43:4,10,13,17
44:5,9,14 48:21
50:25 52:5,20 53:13
59:19 60:24 61:12
62:8 65:16 70:18
71:24 76:10 78:9
**seeing**  47:9
**seen**  19:4 22:10,22
31:19 42:21,23 47:6
48:4 71:1
**semester**  33:20
45:24 75:2 76:10,14
**semesters**  45:20
**send**  25:5 27:18
43:25 48:11,12
52:22 55:8
**sending**  41:22
**sense**  64:16
**sent**  48:9 51:12
52:18 53:10,14 54:9

**sentence**  49:21 52:2
52:5 59:13,19 60:20
60:24 62:1,8
**september**  2:14 40:2
42:12 43:1,20 44:17
44:19,21 46:22
47:16
**service**  12:4 25:19
43:9
**serviced**  11:25
**services**  11:24
**servicing**  38:2 43:8
43:14 51:9,17,20,23
**set**  3:24 79:17
**setting**  8:5
**shared**  77:13
**sheet**  80:7,10,12,15
82:11
**show**  17:8 43:23
70:14
**showing**  22:3 29:19
**sign**  32:18 40:18,24
42:5 80:9
**signature**  20:18,19
21:11 24:5,6,8,17
25:14,25 26:1,22
39:25 40:12 82:14
**signed**  21:5 26:21
26:23 27:10 28:17
29:15 39:15 62:4
66:6 74:24
**significant**  36:19
**signing**  60:7 68:4
80:11
**sioux**  43:9
**sir**  5:3
**site**  46:17
**sitting**  19:2
**situation**  75:20
**sixth**  14:11
**slm**  1:8 2:11 4:13
23:9,19
**smoak**  3:9
**social**  20:8

**sold**  64:10
**solutions**  1:7,23
4:12
**someplace**  21:6
**somewhat**  6:24
12:16
**soon**  19:22
**sooner**  32:1
**sorry**  10:9 17:18
18:20 19:17 23:16
36:2 39:5 41:14
44:8,11 58:22 63:20
66:12,14,25 77:14
**sort**  69:10
**space**  80:7
**speak**  9:6,9 13:14
14:22 15:7 58:14
**speaking**  14:24 29:5
**specifically**  15:12
16:23 45:9 63:2
68:23
**speed**  60:9
**spell**  5:8
**spelled**  23:6
**spoke**  54:24
**spoken**  28:24 64:25
**springs**  13:5,8 36:15
43:2 47:11
**ss**  79:3
**start**  7:23 63:12
**started**  6:18 11:9,17
21:22 42:2 46:8
57:4
**starts**  52:2
**state**  3:18 5:8 12:1
50:16 52:17 53:9
54:15 62:1 68:25
79:3,7 80:6
**stated**  6:14 46:11
**statement**  2:15,16
41:3 47:21 48:7
53:5 54:12 55:1
70:17 71:4,16,20
**statements**  79:10

**states**  1:1 4:10 44:2
**status**  14:8,14
**stay**  39:2
**staying**  76:2
**steese**  5:15
**step**  28:22 34:14
**steps**  29:11
**stewart**  3:9
**storage**  64:8,11
**street**  1:24
**stressors**  73:11
**strongly**  72:16,18,21
73:1
**student**  11:20 16:17
32:19 33:14 34:25
40:7,16,22 48:19,24
49:22 50:21 65:13
69:1 74:17
**studies**  75:8
**stuff**  64:2
**subject**  80:11
**submitted**  13:17
39:3,6
**subpoena**  9:8
**subscribed**  82:16
**subsidiaries**  1:10
4:15
**subsidized**  44:3
**substance**  82:10
**successor**  66:16
**successors**  1:10 4:16
66:12,13
**suffering**  62:5
**suffice**  68:3
**sufficient**  38:4,6,24
**suite**  1:24 3:6,10
**supposed**  13:21,22
**sure**  9:7 15:1 19:19
24:10,13 26:14
27:13 32:1 36:4,4
41:15 47:8 50:18
51:2 59:1,4 65:21
67:1 74:8 77:16,16
77:19

**surprised**  64:18
  65:15
**swindled**  68:3,6
**switch**  29:3 35:17
**sworn**  5:24 82:16
**system**  58:20 59:10
**systems**  69:1

**t**

**t**  1:4 4:12 5:1,11
  79:1,1 81:3
**tags**  38:11
**take**  12:18 17:9,24
  28:22 29:10,11,17
  30:17 32:22 34:14
  49:10 51:21
**taken**  1:19 6:21 7:9
  8:20 11:20 79:7,11
**talk**  34:16 39:1
  63:25 72:11
**talked**  32:17 50:23
  55:22
**talking**  12:7 13:18
  15:6 19:12 27:8
  28:2 29:3 45:9
  50:20 53:7 68:2
  72:11 76:7
**tape**  64:4
**technical**  31:4
**telephone**  7:19
**tell**  5:24 15:11 35:3
  61:5,9 67:19
**term**  50:4
**terms**  53:23 64:19
  74:24
**testified**  6:1 8:21
  15:10 67:1
**testify**  8:12,16
**testimony**  8:4,6 27:5
  28:23 31:5 32:4
  39:24,25 40:11
**text**  25:4
**thank**  5:2,7,20 31:3
  59:3

**thereof**  3:16 79:16
**thing**  25:16 32:6
  36:9 66:23
**things**  30:2 37:18
  57:17 73:22 76:12
  79:12
**think**  13:1 14:6
  26:10 28:15,23
  42:12 57:5,18 59:8
  61:23 63:22 65:17
  66:2,23 69:20,25
  72:15 73:18
**thinking**  54:22
**thinks**  18:14
**third**  11:10 13:25
**thirty**  80:16
**thompson**  3:16,18
  6:10 79:6,21
**thought**  16:9 21:18
  26:5 33:25 40:17
  42:7 51:15,19 60:7
  66:5 70:2 71:14
  74:22
**threatened**  62:14
**three**  11:17 14:18
**time**  4:6 10:13,16
  12:13,17 13:25 14:2
  14:24 15:16,23,24
  16:4 17:24 19:25
  21:21 26:12 35:7,11
  37:2,4,4 43:25 45:8
  46:6 51:7 53:1 55:4
  55:14,16 56:25
  57:13 58:4 63:4,11
  70:12 73:5,10 75:6
  76:20,21 78:12
  79:11
**times**  13:14 14:19
  58:16 72:5
**today**  7:14,17 8:11
  8:17 9:4,22 77:13
**today's**  9:10
**token**  7:24
**told**  19:24 54:25
  55:5 56:3 61:17

67:9 72:15
**top**  20:8 25:7 42:11
  43:7 46:21 70:17
  76:2
**topics**  9:9
**total**  14:21 45:16
  73:16
**tougher**  38:15
**townhouse**  13:9
  36:24
**townhouses**  36:21
**track**  58:24
**train**  58:24
**training**  6:25
**transcript**  7:7 79:9
  79:10,13 80:17,18
**transcription**  82:7
**transfer**  70:4
**transferable**  69:3
**transference**  60:23
**trial**  8:22
**tricky**  22:5
**tried**  72:7 73:3 75:9
**true**  79:9
**trusted**  69:13
**truth**  5:25,25,25
**truthfully**  8:12,16
**try**  18:8 22:3 31:3
  37:17 62:12,24
  73:22
**trying**  29:4 36:25
  37:17 56:5,25 57:1
  57:16 64:3,15,23
  71:12,13 75:19
  77:15
**tuition**  40:15 49:12
**turn**  12:25
**twice**  13:16
**two**  11:17,18 12:14
  12:15 14:1 20:9
  21:25 22:18 23:13
  23:18 32:2 45:20,23
  49:14,16,17 50:16
  63:23,23 66:18
  69:14

**type**  23:20 38:1
  64:17 74:21
**typed**  23:22 48:7
**types**  23:13
**typewriting**  79:8
**typewritten**  47:20
  48:18

**u**

**u**  5:11
**uh**  7:10 24:23 25:6
  38:20 49:11 51:25
  53:7 65:2 67:18
**unable**  30:20 62:3
**unbeknownst**  56:24
  57:5,7
**undergoing**  56:24
**undergrad**  72:17,22
  72:23
**undergraduate**
  11:22 12:5 68:25
**understand**  7:1 8:9
  9:7 10:14 27:5,16
  29:4 31:5 40:5
  41:20 61:12 64:5
  75:15
**understanding**  41:5
  45:12 50:1,20 51:14
  63:1
**understood**  7:3 32:8
  56:9 64:17 68:5
  73:8 77:8
**undertook**  37:10
**unfortunately**  25:12
**unit**  64:8,11
**united**  1:1 4:10
**unknown**  1:9 4:14
**unquote**  68:11
**upset**  57:14
**upsetting**  73:8
**upside**  24:19,24
  25:1,4
**use**  18:13

|  v  |
| --- |

**v**  1:6 80:1 81:1 82:1
**verbally**  7:10 58:15
**verify**  62:24
**veritext**  1:23
**vermont**  10:21 11:4
  37:18
**versus**  4:12
**video**  4:7,9 7:16
**visited**  72:5

|  w  |
| --- |

**wait**  10:23 45:8,8
  71:24
**waited**  34:10 53:4
**waiting**  10:22 25:23
**walked**  28:15 65:15
**want**  11:18 13:6
  22:20 50:18 54:19
  57:18 77:19
**wanted**  35:12 60:9
  72:4
**water**  36:19
**way**  18:18 25:21,22
  34:1 44:25 45:1
  59:21 61:8 67:17
  68:8 73:3
**we've**  27:8 61:1 68:2
**web**  7:15 46:17
**wednesday**  1:19
  3:14 4:1
**week**  11:9,10 13:1
  14:6,7,12 20:2
**week's**  19:25
**weeks**  11:17,18 14:1
  21:25
**weird**  29:13 40:17
**went**  12:11 14:7
  15:16 16:5,13 22:12
  23:14 42:3 52:24
  65:14
**whereof**  79:17
**witness**  3:23 4:8 5:6
  5:10,14,18 8:21
  9:17 30:19 42:19

47:4 48:2 70:24
78:1 79:17 80:3
**women**  66:18
**wondering**  55:13
**words**  68:17
**work**  9:1 15:24 31:4
  34:8 37:1 57:1
  67:17 73:21 76:1
**worked**  65:18 66:15
  76:20
**working**  12:12
  13:11 24:12 37:2,7
  37:11 72:3
**works**  6:20
**worried**  76:16
**write**  40:4 71:15
**written**  7:7 20:19,20
  41:4
**wrong**  64:22 65:4
**wrote**  20:11,13 71:5

|  y  |
| --- |

**yeah**  11:16,18 14:19
  15:4 16:11 18:23
  21:17,20,23,25 22:2
  23:1,3,3,6,9 26:9
  30:19 32:2 34:9
  37:14 38:16 39:1
  40:21 41:22 42:25
  43:22 46:2 48:16
  50:25,25 53:12,12
  53:16,18,20,21 55:7
  55:7,7,24 56:2,18
  56:18 57:11,14 60:5
  60:13,15 61:16
  62:22 63:17 64:15
  66:14 74:10,15 75:7
  75:14 76:10,15,17
  76:22
**year**  10:23 34:4
  36:18 37:12 39:19
  41:7 42:4 48:18,24
  49:12 51:23,25
  52:17 53:4,7,10
  63:12 72:8

**years**  32:2
**yont**  67:12

Alaska Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30

(e) Review by Witness; Changes; Signing. If
Requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days in which to review the transcript or
recording after being notified by the officer that
the transcript or recording is available and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
subparagraph (f)(1) whether any review was
requested and, if so, shall append any changes made
by the deponent during the period allowed.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2014.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.